Ets-Hokin & Galvan, Inc. (formerly Ets-Hokin & Galvan) v. Commissioner.
Ets-Hokin & Galvan, Inc. v. Commissioner
Docket No. 89382.
United States Tax Court
T.C. Memo 1962-136; 1962 Tax Ct. Memo LEXIS 173; 21 T.C.M. (CCH) 717; T.C.M. (RIA) 62136; June 1, 1962
Samuel Taylor, Esq., 1308 Balfour Bldg., San Francisco, Calif., Robert M. Winokur, Esq., Jesse Feldman, Esq., and Warren Wertheimer, Esq., for the petitioner. John O. Hargrove, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Year
Deficiency
1955
$44,805.53
1956
24,193.55
1957
27,963.77 As a result of agreements by the parties, the only issue remaining for our consideration is whether *175 respondent properly determined that certain payments made by petitioner pursuant to a profit-sharing plan were not deductible in either the amount or year claimed. Findings of Fact Some of the facts have been stipulated. The stipulations, including the facts appearing in the stipulated exhibits, are hereby found. Petitioner is a corporation organized and existing under the laws of the State of California with its principal office at San Francisco, California. Petitioner was incorporated in 1946 and filed its corporation income tax returns for the calendar years 1955 through 1957 with the district director of internal revenue in San Francisco, California. At all times material hereto petitioner kept its books and filed its tax returns on an accrual method and on the basis of a calendar year. Petitioner and a predecessor partnership have been engaged continuously since 1920 in the electrical contracting business. Since 1925, the business has been operated through branches, which were, during the years here in issue, located in San Francisco, Monterey, Stockton, Wilmington, and San Diego. In addition, petitioner had branches in Oakland and San Mateo in 1955 and 1956, which were *176 subsequently merged into the San Francisco branch. The profits [or losses] of petitioner's operations from 1949 through 1958 were as follows: San
Wilming-
Year
Francisco
Stockton
Monterey
ton
1949
$14,261
$ 1,369
$ 8,684
[$ 30,663]
1950
45,399
11,893
8,941
14,357
1951
59,562
18,705
9,467
42,559
1952
5,145
41,127
19,836
3,960
1953
[37,842]
12,130
22,997
64,257
1954
14,657
7,879
25,374
87,787
1955
88,375
[21,401]
47,531
98,427
1956
43,714
5,668
46,594
163,347
1957
[38,819]
42,254
51,342
63,762
1958
[9,243]
26,398
51,398
116,978
Newport
Year
Beach
San Diego
Oakland
Over-all
1949
[$ 40,835]
[$ 35,654]
[$ 13,979]
[$ 96,817]
1950
Discontinued
31,269
5,622
106,237
1951
54,094
9,491
193,879
1952
81,031
14,123
165,223
1953
San Mateo
83,586
[19,905]
125,221
1954
$ 14,809
46,360
827
197,691
1955
[623]
98,057
[33,098]
277,268
1956
[101,847]
135,072
[22,137]
270,410
1957
Discontinued
285,093
Discontinued
403,631
1958
390,981
576,511
Although subject to supervision, branches were autonomous, acting *177 on their own responsibility in substantially all business activities. Each branch maintained a separate set of books and the results of their operations appeared separately in petitioner's annual reports. Petitioner employed a manager or managers to supervise the operation of each of its branches. The managers were selected by petitioner's president and were subject to removal by him. Petitioner's corporate officers negotiated financing for the entire company. The branch managers, each having been made a vice president, had authority to sign contracts for petitioner. Since 1925, when petitioner's predecessor first operated through branches, branch managers and certain other key employees of each branch received bonuses based upon the profits, if any, of the branch in which they worked without regard to losses, if any, in other branches. These bonuses were a matter of individual negotiation between the employee and the petitioner. During the taxable years, petitioner had four officers who exercised supervision over the entire company (hereinafter called corporate officers). They were: Louis Ets-Hokin, president; M. H. Lichtman, secretary-treasurer; Jeremy Ets-Hokin, vice president; *178 R. S. Lauter, vice president and general counsel. Louis Ets-Hokin, petitioner's president, was in voting control of petitioner at all times material hereto. R. S. Lauter and Jeremy Ets-Hokin are related to Louis Ets-Hokin. Salaries of the corporate officers were charged ratably among petitioner's branches according to the relative sales of each. The corporate officers also received bonuses based upon the over-all profits of petitioner. These bonus arrangements were also a matter of negotiated contract between the corporate officer and petitioner and were charged ratably among petitioner's profitable branches according to their relative profits. At all times material hereto petitioner paid all branch managers and some estimators and superintendents basic salaries and bonuses based upon profits, if any, of the branch in which they worked. Salesmen received additional compensation in the event commissions exceeded salaries. In addition, at the discretion of branch managers, bonuses were paid at Christmas to other employees of the branches which had a profit for the year in amounts not exceeding a few hundred dollars each. Except for these discretionary bonuses, other employees of profit *179 branches received no bonuses during the years 1955 through 1957. On December 29, 1955, petitioner duly adopted and executed a profit-sharing plan (hereinafter called the plan) to cover its salaried and clerical employees and a trust (hereinafter called the trust) to receive and manage petitioner's contributions (hereinafter called employer contributions) which were called for under the terms of the plan. The plan provided, in pertinent part, as follows: ETS-HOKIN & GALVAN PROFIT SHARING PLAN ARTICLE I DEFINITIONS * * *
(e) The word "employer" shall mean [petitioner] * * * (f) The words "Board of Directors" shall mean the Board of Directors of petitioner]. * * *
ARTICLE II ELIGIBILITY A. To be eligible to participate as a member * * *
(2) The employee must be employed as a regular full time employee. (3) The employee must be a salaried or clerical employee. (4) The employee must have completed five or more years of continuous employment. (5) The employee must have reached the age of twenty-five (25) years. (6) Upon notification of eligibility by the company, the employee must make and file an application with the trustees to become a member.
*180 B. For the purpose of determining the length of service * * *
(2) Six months or more in any one annual period shall be considered as one year * * *
ARTICLE III EMPLOYER'S CONTRIBUTION A. * * *
(3) In order to maintain and encourage the branch system of doing business established for many years by the employer, the employer's contribution will be computed separately for each branch; and the amount determined for each branch shall be contributed for the exclusive benefit of those members whose total compensation has been included in whole or in part in the expenses of that branch. (4) For those branches whose sales for the five (5) preceding taxable years have averaged under one million dollars ($1,000,000), the employer shall contribute: (a) A sum equal to five per cent (5%) of the total compensation paid to all the members of that branch, providing the profits of that branch exceed fifteen thousand dollars ($15,000) and are not over sixteen thousand dollars ($16,000). [Clauses (b) through (k) provide for graduated employer contributions in the event of increased branch profits, up to 15 per cent when branch profits exceed $25,000.] (5) For those branches *181 whose sales for the five (5) preceding taxable years have averaged over one million dollars ($1,000,000), the employer shall contribute: (a) A sum equal to five per cent (5%) of the total compensation paid to all the members of that branch, provided the profits of that branch exceed thirty thousand dollars ($30,000) and are not over thirty-two thousand dollars ($32,000). [Clauses (b) through (k) provide for graduated employer contributions in the event of increased branch profits, up to 15 per cent when branch profits exceed $50,000.] ARTICLE V CREDITING OF [EMPLOYER'S] CONTRIBUTIONS * * *
E. * * * The account of each member who shall be employed by [a] branch or branches for which a contribution has been made shall have his account credited with a proportionate amount of such contribution equal to the proportion that his total compensation paid for that branch for such year bears to the total compensation of all members of the branch of the employer by which said employee is employed for such year. * * *
ARTICLE VI VESTING * * *
B. If a member's employment is terminated for any reason whatsoever prior to the completion of ten continuous years of *182 employment, the following rules shall apply: (1) If the member should voluntarily leave the employment of the company for any reasons other than death, retirement or disability, he shall forfeit the full amount credited to his account. * * *
C. If member's employment is terminated for any reason whatsoever after the completion of ten continuous years of employment, the following rules shall apply: * * *
(2) If a member's employment is terminated by his death, disability, retirement or discharge by the company * * *, the member shall be entitled to one hundred per cent (100%) of the amount credited to his account. (3) If a member should voluntarily leave the employment of the company * * *, he shall receive 100% of the amount credited to his account. * * *
H. For the purpose of determining * * * the credits to the accounts of the remaining members resulting from a forfeiture under this agreement * * *
(4) The trustees shall divide the amount deemed forfeited by the departing employee among the remaining members of the branch in which the employee was last employed during his employment in the proportion that each member's total credits * * * bear to the *183 total credit of all members of that branch * * *
Payments from the trust were to be made to appropriate employees "[upon] retirement, death or disability or termination of employment" except as otherwise provided in the plan. Petitioner did not seek a letter of approval from respondent as to the plan, choosing instead to deduct its employer contributions in the appropriate years and include the details of the plan in its 1955 income tax return. Other than the plan, peetitioner had no pension, stock bonus, profit-sharing, or annuity arrangement covering its salaried or clerical employees during the years here involved. The following is a schedule of employee coverage and participation as to the plan in operation as it applied to (1) officers, stockholders, supervisory employees, and employees receiving total compensation in excess of $10,000 per annum (hereinafter called the prohibited group) and (2) petitioner's other salaried or clerical employees (hereinafter alternatively called the nonprohibited group or others). Number of Employees
Eli-
Receiving
gible to
employer
Covered
partici-
con-
by plan
pate
tributions
1955
Total
93 *
34
28
Prohibited group
22
17
16
Others
71
17
12
1956
Total
100
39
31
Prohibited group
21
18
15
Others
79
21
16
1957
Total
98
41
27
Prohibited group
21
19
15
Others
77
22
12
*184 Of those employees receiving employer contributions, 16 of 28 in 1955, 18 of 31 in 1956, and 14 of 27 in 1957 were from among the lowest-paid two-thirds of petitioner's eligible employees. During 1955 through 1957, petitioner's eligible employees received the following compensation (salary plus bonus) and employer contributions: 1955
1956
1957
Corporate Officers
Salary
$ 67,320
$ 67,673
$ 65,180
Bonus
32,938
31,267
54,508
Employer contribution
13,914
12,343
15,733
Employer contribution as a percent of
total compensation
13.9%
12.5%
13.2%
Prohibited Group Other than Corporate Officers
Salary
$ 88,707
$106,297
$128,933
Bonus
163,298
188,747
298,809
Employer contribution
36,658
41,205
58,027
Employer contribution as a percent of
total compensation
14.5%
14.0%
13.6%
Others
Salary
$ 96,300
$122,150
$134,615
Bonus
6,938
1,445
300
Employer contribution
10,353
14,075
9,948
Employer contribution as a percent of
total compensation
10.0%
11.4%
7.4%
Allocation of contributions under petitioner's profit-sharing *185 plan within a branch was made ratably according to the total proportionate compensation of the employee. In every such instance, where a contribution was made it amounted to the maximum 15 percent of compensation. The eligible corporate officers received, as their contribution under the plan, an aliquot part of the employer contribution to the employees of each profitable branch based upon that portion of the total compensation of those officers, both salary and bonus, which had been allocated to that branch. The corporate officers received no contribution for that part of their compensation allocated to nonprofitable branches. In the years 1955 to 1957, inclusive, the following percentages of the number of petitioner's salaried or clerical employees had accounts in the trust which were nonforfeitable (i.e., vested): Year
Prohibited Group
Others
1955
76.5%
41.2%
1956
88.9%
33.3%
1957
89.5%
54.5% During the years here in issue there were no forfeitures of past employer contributions under the plan. All participants whose employment terminated were paid the full amounts allocated to their respective accounts under the trust. Petitioner's branches *186 were located near naval bases and many of petitioner's employees in the category covered by the plan were wives of naval personnel and terminated their employment when their husbands were transferred to other naval bases. The following table summarizes the turnover of the 219 covered employees hired by petitioner during the years 1950 through 1954: Calendar
year of
termination
Number
in relation
termi-
Number
Percent
to calendar
nating
remaining
remaining
year of
during
at end of
at end of
hiring
period
period
period
Year of hiring
103
116
53 %
First year
60
56
25.6%
Second year
14
42
19.2%
Third year
6
36
16.4%
Fourth year
10
26
11.9%
Fifth year
10
16
7.3%
Total termi-
nating
203
On or about June 17, 1959, petitioner adopted a document entitled "Proposed Amendments to the Trust Agreement and Profit-Sharing Plan of Ets-Hokin & Galvan" and on March 15, 1960, petitioner adopted an "Amended Profit-Sharing Plan." These amendments made, among others, the following changes in the plan: ETS-HOKIN & GALVAN, INC. AMENDED PROFIT-SHARING PLAN (Effective January 1, 1959) * * *
5. * * * * * *
(c) Subparagraph *187 (3), of Paragraph A. of Article III of [the plan] is hereby amended to read as follows: "(3) In order to establish the employer's contribution on the basis of its branch system of doing business, the amount of the employer's contribution shall be the aggregate of the amounts determined for each branch separately in accordance with the formula set forth in the following subparagraphs (4) and (5), based upon the separate profits of each branch, and the total compensation of members whose compensation has been included in whole or in part of the expenses of that branch; * * *" * * *
(f) Paragraph E. of Article V of [the plan] is hereby amended to read as follows: "E. * * * [The] trustees shall allocate * * * the employer's contribution for the taxable year among the accounts of members who are eligible * * * in proportion to their total compensation for the year." In addition: (a) Eligibility for participation was reduced from 5 years to 3 years of continuous service. (b) Employees with less than 10 years of service who left the company voluntarily were to receive a proportionate amount of their profit-sharing account. This amount was 12 1/2 percent for each year *188 of continuous service starting with the third year and running through the ninth year. (c) The 25-year age limit on eligibility was removed. (d) Forfeitures were to be added to the annual employer contribution. Although these amendments did not reduce petitioner's efficiency or profits, objections were raised by some employees of profitable branches that they were being required to carry other nonprofitable branches. During the years here in issue, and pursuant to a collective bargaining agreement with the International Brotherhood of Electrical Workers, petitioner made contributions equal to 1 percent of its electrical worker payroll to the National Electrical Benefit Fund (hereinafter called the Fund), a qualified pension plan which covered petitioner's electrical workers. The electrical workers did not have individual shares in this fund. Petitioner could not have included the electricians in the plan in addition to maintaining the payments it made to the Fund and have retained its competitive business position. The total number of petitioner's employees as of the dates specified was as follows: 1955
1956
1957
March 15
437
531
515
June 15
439
593
514
September 15
505
495
490
December 15
511
572
465
*189 The total number of electricians employed by petitioner, as of the dates specified, for whom petitioner made contributions to the Fund was as follows: 1955
1956
1957
March 15
333
411
395
June 15
325
475
380
September 15
380
384
368
December 15
391
458
322
The number of salaried and clerical employees of petitioner, as of the dates specified, for whom petitioner made contributions to the trust was as follows: 1955
1956
1957
March 15
28
31
27
June 15
28
31
27
September 15
28
31
27
December 15
28
31
27
The percentages of petitioner's total employees, as of the dates specified, for whom contributions were made either to the Fund or to the plan were as follows: 1955
1956
1957
March 15
83%
83%
82%
June 15
80%
85%
79%
September 15
81%
84%
81%
December 15
82%
85%
75%
The Fund and the plan, when considered together, covered substantially all of petitioner's employees. Petitioner made contributions to the trust as follows: Year of
Year of operation for which
actual
contribution made
payment
1955
1956
1957
1955
$ 100.00
1956
60,824.76
1957
$63,036.95
1957
$29,028.99
1958
52,316.22
Amounts de-
ducted by
petitioner
$60,924.76
$63,036.95
$81,345.21
*190 All amounts deducted were actually paid not later than the time prescribed by law for filing the income tax return in which petitioner took the deduction. Respondent determined that, of the amounts actually paid, $50,192.92 for 1956 and $57,330.50 for 1957 were nonforfeitable (i.e., vested) and allowed those amounts as deductions on petitioner's 1956 and 1957 returns, respectively. He disallowed the remaining amounts of $60,924.76, $12,844.03, and $24,014.71 for the years 1955, 1956, and 1957, respectively. Opinion Petitioner initiated a profit-sharing plan for its salaried and clerical employees and made contributions pursuant thereto for the years 1955 through 1957. Petitioner deducted the full amount of its contributions, and claims to be entitled to do so under section 404(a) of the 1954 Code. [1] Respondent has refused to qualify this plan and has denied deductions of petitioner's contributions that were not either (1) paid during the taxable year, or (2) nonforfeitable with respect to the participating employee. Respondent's position is based on the provisions of section 404(a)(3). [2]
*191 The sections referred to are subject to the limitations of section 401, providing that: SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS (a) Requirements for Qualification. - A trust * * * forming part of a * * * profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section - * * *
(3) if the trust * * * [is] designated by the employer as constituting * * * [part] of a plan intended to qualify under this subsection which benefits either - (A) 70 percent or more of all the employees, or 80 percent or more of all the employees who are eligible to benefit under the plan if 70 percent or more of all the employees are eligible to benefit under the plan, excluding in each case employees who have been employed not more than a minimum period prescribed by the plan, not exceeding 5 years, employees whose customary employment is for not more than 20 hours in any one week, and employees whose customary employment is for not more than 5 months in any calendar year, or (B) such employees as qualify under a classification set up by the employer and found by the Secretary *192 or his delegate not to be discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees [hereinafter, for brevity, referred to as the prohibited group]; and (4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are * * * [the prohibited group]. The main thrust of respondent's contention that petitioner's profit-sharing plan does not qualify under the statute is that it is, in fact, and in operation, discriminatory in favor of petitioner's officers, stockholders, and supervisory and highly salaried employees. [3] The issue necessarily comes down to whether the de facto discrimination, which the record is said to demonstrate, being the accidental and peculiar result of the condition and circumstances of petitioner's business operation, is, nevertheless, consistent with the congressional purpose; or whether its mere existence is sufficient to condemn the plan. *193 This in turn requires us to determine whether petitioner was effectively forbidden to institute a profit-sharing plan which would conform with the statute, and at the same time continue the principal organizational structure of its traditional business operation. We think it would be unfortunate to conclude, unless the statute clearly compels it, that a long-established business custom must be abandoned in order to qualify a profit-sharing plan for the employees of that business, where, as here, the plan contains no prohibited discrimination within any separate branch. [4]
The difficulty arises primarily because of the combination of two aspects of petitioner's business. First, the officers and some supervisory employees, in addition to their base salaries, were entitled to longstanding bonus payments which were, in effect, additional compensation; *194 and, conversely, many of the minor employees remained with petitioner for too short a time to come within reach of bonus status because, as our findings show, they had family obligations requiring them to leave. And, second, petitioner's business was operated under a branch organization which called for bonuses and employer contributions to be paid only to employees of profitable branches. It is this interplay of salary and bonus together with preferential treatment of profitable branches, [5] and not discrimination within the plan itself, which produced higher average contributions in relation to compensation for the prohibited group in all branches combined as compared with the similarly combined nonprohibited group. There is, of course, discrimination in computing the compensation to be received by petitioner's various categories of employees. This does not concern us, since respondent has not challenged the prohibited group's compensation *195 as being unreasonable. See H.S.D. Co. v. Kavanagh, 191 F. 2d 831 (C.A. 6, 1951). The important fact is that, once the compensation is computed, contributions based upon it are a constant percent and thus do not discriminate. Ryan School Retirement Trust, 24 T.C. 127 (1955); Volckening, Inc., 13 T.C. 723 (1949). Determination of benefits according to a fixed percentage of wages should not be considered discriminatory even though it results in larger benefits to highly paid employees. * * * H. Rept. No. 2333, 77th Cong., 2d Sess. 51 (1942), 1942-2 C.B. 372, 413. The method of computing employer contributions for the corporate officers necessarily was distinct from that applying to employees whose work applied to only one branch. This is the consequence of petitioner's method of doing business, which attributed comprehensive company salaries proportionally to profitable and nonprofitable branches. But the officers' salaries attributable to nonprofitable branches did not form the base for employee contributions. And variation itself is not material, it must be discriminatory. [6] This is not present here. The corporate officers *196 received employer contributions on their bonuses, as did all employees receiving them. And only that part of their salary which was allocated to profitable branches formed the base for employer contributions, a procedure which applied equally in operation and percentage to all other employees. In fact, the bonuses paid to petitioner's corporate officers were in a sense less favorable than the branch bonuses, since they were subject to deduction for any loss branches and only the net bonus was then used as the base for employer contributions. Although the overriding aspect of discrimination may, as we interpret the legislative intent, fail to disqualify petitioner's plan, it is, of course, still subject to disqualification if it fails to conform to the specific requirements of the statute. Respondent's objections to the plan under consideration, in addition to his primary contention that it has resulted in *197 discriminatory employer contributions, also includes the contention that in two respects the plan violates the statutory requirements pertaining to general employee coverage. Section 401(a)(3) and the regulations [7] provide alternative means of satisfying its terms. Even after giving due consideration to the added presumption attached to respondent's determination, [8] it seems to us that petitioner's profit-sharing plan should qualify as to coverage under section 401(a)(3)(B). Although limited, it is universally applicable to all similarly situated salaried and clerical employees. This is a coverage provision specifically authorized by section 401(a)(5). [9] Respondent does not contend that petitioner's plan fails in this respect. *198 In concluding that the plan contains the prohibited discrimination in coverage, respondent relies principally upon the 5-year eligibility requirement, pointing to the fact that only 17 of 71, 21 of 79, and 22 of 77 nonprohibited group employees were eligible for the years 1955, 1956, and 1957, respectively, as compared with 17 of 22, 18 of 21, and 19 of 21 for the prohibited group in the same years. In testing the reasonableness of delayed eligibility requirements, we must consider "[all] of the surrounding and attendant circumstances" (Sec. 1.401-1(b)(3), Income Tax Regs.), including the rate of turnover among petitioner's salaried and clerical employees. Ryan School Retirement Trust, supra. Respondent had acknowledged that "a service requirement for eligibility long enough to exclude temporary employees may be satisfactory." PS No. 22, Sept. 2, 1944. Here, through circumstances largely beyond petitioner's control, [10] the rate of turnover was extremely high [11] during the first 5 years and there was testimony that after that it was minimal.[12] This high turnover and the administrative problem of forfeitures, which would necessarily *199 occur when short-term employees left, combine to justify a comparatively long eligibility requirement. Section 401(a)(3)(A), although not applicable here, specifically provides for delayed eligibility, not exceeding 5 years. There is hence persuasive evidence of a congressional recognition of the propriety of such a delay in the proper circumstances.[13] The fact that the provisions for eligibility excluded a higher percentage of nonprohibited group employees than prohibited group employees was inevitable. An eligibility requirement, by its very nature, excludes primarily the employees more recently hired, a category also composed predominantly of lower-paid employees who have not yet had the opportunity to work up to the higher-paying positions. [14] As we said in the Ryan case, "[if] there is any discrimination here, it would seem to be in favor of the permanent employees as against the impermanent employees, but that is not the type of discrimination contemplated by the statute." Ryan School Retirement Trust, supra, 24 T.C. at 134. *200 The remaining element to be considered as to coverage is whether the 10-year vesting period with its accompanying allocation of possible forfeitures constitutes the discrimination contemplated in section 401(a)(3)(B). While "[vesting] is not a requisite for qualification of a stock bonus, pension, or profit-sharing plan, * * * forfeitures resulting from a lack of vesting may effect discrimination * * *." PS No. 22, supra. A delayed vesting provision such as the one before us is not, however, inherently discriminatory. One similar to it was approved in the case of Ryan School Retirement Trust, supra.Rev. Rul. 57-163, 1957-1 C.B. 128, 146, provides for "fully vested rights after a reasonable waiting period." In testing what is "reasonable," "[the] law is concerned not only with the form of a plan but also with its effects in operation." Sec. 1.401-1(b)(3), Income Tax Regs. Cf. Time Oil Co., 26 T.C. 1061 (1956), remanded other grounds 258 F. 2d 237 (C.A. 9, 1958). But in actual operation there have been no forfeitures. Petitioner's profit-sharing plan does not contain the discrimination in favor *201 of petitioner's officers, shareholders, supervisory employees, or highly compensated employees prohibited by the statute and thus constitutes a qualified profit-sharing plan. The conclusion at which we have arrived makes it unnecessary to consider petitioner's alternate contentions that the union plan for petitioner's electrician employees can be combined with petitioner's clerical employee plan to qualify the whole under section 404(a)(3)(A); or that "integration" of social security benefits not contributed to by, but available to, all petitioner's employees demonstrates by itself lack of discrimination. Sec. 1.401-3(e)(1), Income Tax Regs.
To take account of an agreement between the parties, Decision will be entered under Rule 50. Footnotes
*. Does not include employees whose employment terminated prior to their becoming members of the plan.↩
1. SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN. (a) General Rule. - If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income) but if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year: ↩
2. SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERREDPAYMENT PLAN. (a) General Rule. * * *
(3) Stock Bonus and Profit-Sharing Trusts. - (A) Limits on Deductible Contributions. - In the taxable year when paid, if the contributions are paid into a stock bonus or profit-sharing trust, and if such taxable year ends within or with a taxable year of the trust with respect to which the trust is exempt under section 501(a), in an amount not in excess of 15 percent of the compensation otherwise paid or accrued during the taxable year to all employees under the stock bonus or profit-sharing plan. * * *
(5) Other Plans. - In the taxable year when paid, if the plan is not one included in paragraph (1), (2), or (3), if the employees' rights to or derived from such employer's contribution or such compensation are nonforfeitable at the time the contribution or compensation is paid.↩
3. "[Section] 401(a)(5) specifies certain provisions which of themselves are not discriminatory. However, this does not mean that a plan containing these provisions may not be discriminatory in actual operation." Sec. 1.401-1(b)(3), Income Tax Regs.↩
4. Even respondent's agent was of the opinion that, within any branch, the plan was not discriminatory. "Q. Mr. Gasparre, did you consider that there was any discrimination in favor of * * * [the prohibited group] within any particular branch? "A. * * * Only as to eligibility and the vesting provisions stated in the plan."↩
5. Computation of employer contributions according to the branch organization seems to be authorized by sec. 1.401-3(d)↩. Income Tax Regs., permitting qualification of plans limited to employees "who are employed in certain designated departments."
6. "Variations in contributions * * * may be provided so long as the plan, viewed as a whole * * *, with all its attendant circumstances, does not discriminate in favor of * * * [the prohibited group]." Sec. 1.401-4(a)(2)(iii), Income Tax Regs.↩
7. "If a plan fails to qualify under the percentage requirements of section 401(a)(3)(A), it may still qualify under section 401(a)(3)(B) provided always that (as required by section 401(a)(3) and (4)) the plan's eligibility conditions, benefits, and contributions do not discriminate in favor of * * * [the prohibited group]." Sec. 1.401-3(b), Income Tax Regs.↩
8. See Estate of Harris Fahnestock, 2 T.C. 756↩ (1943). 9. SEC. 401. QUALIFIED PENSION, PROFITSHARING, AND STOCK BONUS PLANS. (a) Requirements for Qualification. - * * *
(5) A classification shall not be considered discriminatory within the meaning of paragraph(3)(B) or (4) merely because * * * it is limited to salaried or clerical employees. * * *↩
10. As our findings show, petitioner's branches were located near naval bases and many of petitioner's salaried and clerical employees were the wives of naval personnel who left when their husbands were transferred. ↩
11. Of 219 employees hired during the period 1950 through 1954, 36 were still employed after 3 years and only 16 remained for more than 5 years. ↩
12. The 5-year limitation in section 401(a)(3)(A) was referred to by the Senate Finance Committee as "excluding certain short service * * * employees." S. Rept. No. 1631, 77th Cong., 2d Sess. 137 (1942), 1942-2 C.B. 504↩, 606. 13. It is not clear that the full 5 years was a requirement of petitioner's program. Petitioner contends that eligibility really was 4 years or less although payment was not made unless the fifth year was completed. ↩
14. Even so, a vice president, an office manager, two managers, and an assistant manager of branches were excluded for all or a portion of the period.↩