RYAN SCHOOL RETIREMENT TRUST, BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 49445. Filed April 29, 1955.

*Richard H. Forster, Esq.*, for the petitioner.
*Joseph G. White, Jr., Esq.*, for the respondent.

OPINION.

RICE, *Judge:* This proceeding involves deficiences in income tax determined against the Ryan School Retirement Trust as follows:

| Fiscal year ended | Deficiency | Fiscal year ended | Deficiency |
|---|---|---|---|
| October 31, 1945 | $23.25 | October 31, 1949 | $236.76 |
| October 31, 1946 | 152.84 | October 31, 1950 | 482.28 |
| October 31, 1947 | 149.25 | October 31, 1951 | 734.87 |
| October 31, 1948 | 128.02 | | $1,907.27 |

The only issue is whether the Ryan School Retirement Trust was a pension trust exempt from taxation under section 165 (a) of the Internal Revenue Code of 1939, during such years.

All of the facts were stipulated, are so found, and are incorporated herein by this reference.

The Ryan Aeronautical Company (hereinafter referred to as the Company) was incorporated under the laws of the State of California on June 5, 1931. A wholly owned subsidiary, the Ryan School of Aeronautics (hereinafter referred to as the School), was incorporated under the laws of the State of California on January 7, 1935. The School assumed all of the Company's activities of student training. Prior to the entrance of the United States into World War II, both corporations had carried on their activities in California. In 1942 the School's pilot-training activities were transferred to Arizona; and in that year another wholly owned subsidiary of the Company, the Ryan School of Aeronautics of Arizona (hereinafter referred to as the Arizona School), was incorporated under the laws of the State of Arizona.

In the fall of 1942, the Company began considering the possibility of adopting a pension and profit sharing plan for its salaried employees and the salaried employees of the schools. The purpose of such a plan was to retain in the Company's and the schools' employ salaried personnel who worked many extra hours each week without additional compensation. The Company considered it unnecessary to include hourly paid workers since it had a production bonus plan for them and, in addition, paid them time-and-a-half for work in excess of 40 hours per week.

The Company adopted a pension plan covering its salaried employees and those of its two subsidiaries, effective as of October 31, 1944. A separate trust was established for the Company and for each school. The School's trust is the only part of the pension plan involved in this proceeding.

The plan as originally written provided the following pension benefits: (1) All salaried employees of any of the companies with 12 months of service as of October 31, 1944, or any subsequent October 31, were eligible to participate in the plan; (2) the entire contribution was to be made by the employers, and was to be based on the consolidated profits of the three companies; (3) as contributions were made by each company each year, they were to be allocated to the accounts of all eligible participants who received compensation from that company, on the basis of such compensation and the number of years of service of the participant with that company or with any of the companies; (4) a participant who retired at or after age 65, or became disabled at any time was entitled to 100 percent of the amount in his

account, regardless of how long he had been in the plan; (5) in the event a participant died, his estate was entitled to 100 per cent of the amount in his account, regardless of how long he had been in the plan; (6) if a participant was over age 55 and had 15 years of service, he was entitled to 100 per cent of the amount in his account upon termination of employment, regardless of the reasons for termination and regardless of how long he had been in the plan; (7) in the event of termination of service of a participant, other than by reason of death, disability, or retirement, he received a percentage of the amount in his account, depending upon how many years he had been a participant under the plan; (8) if the termination of service occurred prior to the second October 31 as of which the participant had been in the plan, he received $50; (9) after he had been in the plan for two October 31s, he received 20 per cent of the amount in his account, and each year thereafter the percentage was increased by 10 per cent so that after 10 years of participation, a participant would receive 100 per cent of the amount in his account; (10) any amounts in the account of a participant which were not distributed to him because his rights had not become fully vested were to be added or forfeited to the accounts of all the remaining participants of all three trusts in the proportions that these accounts held to each other; (11) in no event could any contribution by any company ever revert to the company; and (12) in the event of the termination of the plan by a company, all participants employed by that company were entitled to 100 per cent of the amounts in their accounts.

On November 30, 1944, the plan was submitted to the Commissioner of Internal Revenue for his approval that it met the requirements of section 165 (a) of the Code. In requesting the Commissioner's approval of the plan as submitted, the three companies advised him as follows:

It has been the practice of the management to transfer employees as occasions warranted from one company to another, and at times some of the employees have had duties divided between two of the companies, with salary divided proportionately in relation to services rendered to each company. In a few cases, employees have, throughout the course of their services, worked at various times for each of the companies. For this reason, the management is of the opinion that to set up an equitable profit sharing plan it would be necessary to make it on as nearly as possible a consolidated basis, even though the companies file tax returns on an individual basis.

Before approving the plan, the Commissioner required that the trust agreement be amended so that instead of contributions being made by all three companies on a consolidated profits basis each company would contribute out of its own profits for its own employees. That amendment also provided that forfeitures would be divided among the remaining participants employed by the Company or the

School in whose trust the forfeitures occurred rather than among the remaining participants of all three trusts. After the required amendment was made, the Commissioner, on February 13, 1945, ruled that the plan met the requirements of section 165 (a) and that the trusts were exempt from taxation.

On May 11, 1945, the trusts were again amended to provide that forfeitures should be divided among all original participants in any one trust who were still employed by any one of the three companies. The reason for this amendment was set forth in a letter from an official of the company to its attorney as follows:

> We are enclosing a copy of the Third Amendment to the Ryan Retirement Trust made effective October 31, 1944. The purpose of this Amendment is to remove from the Agreement the section which has to do with the transfer of employees' benefits from one company's fund to another when employees transfer from one company to another.
>
> This point was overlooked in the beginning and due to the closing of the two schools a number of individuals were transferred from the schools to the company payroll. We find in computing these transfers upon the basis of Section (b) of Article V that it leaves just five people to divide all the money left in the funds of the schools by those people who actually terminated their employment at the schools and did not transfer to the company. We feel that this change in Article V will take care of the situation to the point that as long as the participant is an employee of any of the companies he shall maintain any interest which he may have acquired in the Trust funds of any company for which he has worked.

Such amendment was approved by the Commissioner on June 13, 1945. Between that time and April 12, 1950, four additional amendments (not involved in this proceeding) were made to the trust agreements and were approved by the Commissioner.

At the time the plan was adopted on October 31, 1944, there were 115 employees of the School eligible to participate, of whom 4 were officers and 1 a supervisory employee. For convenience, these 5 employees will hereinafter be referred to as officers. The initial contributions made on October 31, 1944, to the trust for both the officers and other employees were as follows:

*5 officers:*

| | | |
|---|---:|---:|
| T. C. Ryan | $1,509.67 | |
| E. D. Prudden | 2,264.50 | |
| W. K. Balch | 608.06 | |
| C. A. Stillwagen | 880.64 | |
| D. H. Ockerman | 691.93 | $5,954.80 |

*Rank and file employees:*

| | | |
|---|---:|---:|
| C. F. Nesbitt | $1,006.44 | |
| F. B. Churchill | 669.21 | |
| A. J. Mars | 306.54 | |
| Others | 62,739.28 | 64,721.47 |
| Total | | $70,676.27 |

In the first fiscal year of operation, October 31, 1944, to October 31, 1945, 86 of the School's participating employees were terminated and 24 were transferred to the Company. The remaining employees participating in the School trust were the 24 transferred employees and the 5 officers who, after October 31, 1945, also drew their salaries exclusively from the Company. In the subsequent fiscal year ended October 31, 1946, 16 of the 24 employees previously transferred to the Company were terminated, leaving a total of 13 employees, including the 5 officers as the only participants in the School trust.

The 2 schools carried on practically no activity after the fiscal year ended October 31, 1945. They had applications pending before the Civil Aeronautics Board for permission to operate a feeder airline in California and an airline between Los Angeles and Hawaii. Both applications were rejected by the Board in May 1946. On June 28, 1946, the Arizona School was dissolved. The plan and trust covering its employees was terminated and a ruling was obtained from the Commissioner of Internal Revenue that the dissolution of the school and the termination of its pension plan did not affect the remaining trusts. After the outbreak of hostilities in Korea in 1950, the School submitted a bid to the Government to operate a pilot-training school in Mississippi but was not awarded a contract. From March 1948 to September 1951, the School built and operated a gasoline service station, and the 3 employees there employed were covered under the pension plan, and contributions were made to the trust for them. One such employee was terminated on October 15, 1950, and received $50 from the trust fund.

As of October 31, 1951, there were 10 employees eligible to participate in the School trust. Of those 10, 5 were the officers and 3 were rank and file employees who had been participants since the inception of the plan. During the 7 fiscal years ended October 31, 1951, in which the plan had been in operation, the School had made total contributions to the trust in the amount of $72,180.62, and during that period the trust had earned income in the amount of $18,632.86, making a total of $90,813.48 available for distribution or credit to all participants. Of the total amount thus available, $52,603.80 had been credited to the accounts of the 5 officers as of October 31, 1951; $19,134.32 had been credited to the accounts of the remaining 5 employees; and $19,075.36 had been paid out to terminated employees, as follows:

*Credited to 5 officers:*

| | | |
|---|---:|---:|
| T. C. Ryan | $13,336.22 | |
| E. D. Prudden | 20,004.24 | |
| W. K. Balch | 5,371.50 | |
| C. A. Stillwagen | 7,779.42 | |
| D. H. Ockerman | 6,112.42 | $52,603.80 |

*Credited to rank and file employees:*

| | | |
|---|---:|---:|
| C. F. Nesbitt | $8,890.76 | |
| F. B. Churchill | 5,911.69 | |
| A. J. Mars | 2,707.92 | |
| Others | 1,623.95 | $19,134.32 |
| Paid out to terminated employees | | 19,075.36 |
| Total | | $90,813.48 |

The rate by which the original amount credited to each officer's and each rank and file employee's account had increased over the 7-year period, for those who had been continuous participants, was substantially identical, i. e., the original account of each officer increased approximately 883 per cent during the 7-year period, as did the original account of the three rank and file employees, who had been continuous participants.

The respondent determined that the School trust was not exempt from taxation because the distribution of forfeitures to officers discriminated in their favor within the meaning of section 165 (a) (4) of the 1939 Code.[1] He argues that this is so because the actual amount of money credited to the officers as a group was greater than the amount credited or paid to the rank and file employees. He points to the fact that at the outset of the plan the officers were credited with approximately 8.4 per cent of the total trust funds and the rank and file employees with 91.6 per cent; and that by 1951, the operation of the plan had resulted in the 5 officers being credited with 58 per cent of the total trust funds and the rank and file employees with 42 per cent.

In support of his determination, he does not argue that any provisions of the plan, particularly the forfeiture or vesting provisions, were inherently discriminatory. Nor does he question the bona fides of the motives prompting the adoption of the plan, or argue that the result of its operation occurred because of anything other than unforeseen circumstances. See Rev. Rul. 33, part 5, 1953–1 C. B. 280.

His determination is based solely on the provision of his regulations that discrimination within the meaning of the statute "is concerned not so much with the form of any plan as it is with its effects in operation." [2] He thus interprets discrimination as being a difference in the dollar amount of contributions and benefits going to the

---

[1] SEC. 165. EMPLOYEES' TRUSTS.

(a) EXEMPTION FROM TAX.—A trust forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall not be taxable under this supplement and no other provision of this supplement shall apply with respect to such trust or to its beneficiary—

 * * * * * * *

(4) If the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

[2] Regs. 111, sec. 29.165–1, p. 678.

officer group and to the rank and file employee group. Specifically, as applied to the facts of this case, he says that discrimination through forfeitures occurred because the ratio of distribution of total trust funds was 58 per cent to 42 per cent in favor of the officer group.

We cannot agree with the respondent that discrimination within the meaning of the statute inevitably results merely because there is a difference, in favor of the officer group, in either the amount of contributions or benefits. See *Volckening Inc.*, 13 T. C. 723 (1949). On the facts of the case before us here, we do not find that the plan operated to discriminate in favor of the officer group.

The impression that the plan here did so operate is accentuated, we think, because of the means whereby the alleged discriminatory division of trust funds in 1951 came about, and the great difference in the division of those funds between the two groups at the beginning of the plan's operation and in the division 7 years later.

But it is the result, and only that, which the respondent claims is discriminatory. He does not attack the mechanics of the plan's operations by which that result came about. Therefore, we think the real issue here can be put in a better perspective by assuming that the alleged discriminatory division of total trust funds in 1951 was the same as the division of initial contributions to the plan at its inception. For example, with contributions and benefits apportioned on the basis of salary and longevity of service (as is the case here), a company commenced a plan with 10 employees, 5 of whom were officers and 5 of whom were rank and file employees. It made initial contributions of $90,813.48 to the trust; 58 per cent of such sum was credited to the officers and 42 per cent to the rank and file employees. We think our answer that such a plan would not be discriminatory has already been indicated by our holding in *Volckening Inc.*, *supra*. In that case a corporation adopted a pension plan for its employees, of whom 8 out of a total of 15 were participants. Retirement benefits were to equal 30 per cent of an employee's salary with a maximum benefit of $2,400 per annum. Two of the eight employees covered were officers. In the 2 years there before us, the corporation made contributions to the trust, of which 58.3 per cent and 53.2 per cent, respectively, of such contributions were for the benefit of the 2 officers. Retirement annuities were purchased with the trust funds. The larger contributions in behalf of the 2 officers were necessitated because of their advanced age. We said that the plan was not discriminatory even though larger contributions were made for the officers because such contributions bore a uniform relation to the basic or regular rate of compensation. The benefits which the employees received did not discriminate in favor of the officers but, as a matter of fact, discriminated against them, since there was a $2,400 per annum limit on the benefits which they were entitled to receive. That situa-

tion is quite analogous to the one before us here except that the plan here did not discriminate against the officers.

We think that discrimination within the meaning of the statute embodies some real preferential treatment in favor of the officers as against the rank and file employees. That kind of discrimination is not present here, however, because no provision of the plan itself was inherently discriminatory, nor was there any ulterior motive to frame its provisions to channel the major part of the funds to the officer group because of any events or circumstances which the management foresaw or expected to occur. Furthermore, the original shares of the trust fund belonging to the 5 officers and the 3 rank and file employees who were continuous participants of the plan experienced the same rate of increase in amount over the 7-year period. Thus, the ratio between the shares of each such rank and file employee and each officer was the same as at the beginning of the plan.

The respondent did not argue that the vesting provisions and the method of distributing forfeitures used here were inherently discriminatory. Those provisions, however, are the cause of the alleged discriminatory division of the trust funds. But such provisions as were present here would in any plan inevitably operate to give all *permanent* employees (including both officers and rank and file employees) a preferred position over that group of employees among which turnovers are frequent. If there is any discrimination here, it would seem to be in favor of the permanent employees as against the impermanent employees, but that is not the type of discrimination contemplated by the statute.

Reviewed by the Court.

*Decision will be entered for the petitioner.*