PULVER ROOFING CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10703–75, 903–77.     Filed September 19, 1978.

*Donald J. Aquilio, Henry H. Melchor*, and *George C. Shattuck*, for the petitioner.
*Louis J. Zeller, Jr.*, for the respondent.

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income tax:

| Docket No. | TYE— | Deficiency |
| --- | --- | --- |
| 10703–75 | Oct. 31, 1970 | $6,517.00 |
|  | Oct. 31, 1971 | 7,547.00 |
| 903–77 | Oct. 31, 1972 | 2,108.74 |
|  | Sept. 30, 1973 | 2,067.29 |

The sole issue remaining for decision is whether petitioner is barred from deducting, under section 404(a)(3),[1] payments made to a profit-sharing trust on the ground that the plan discriminates in favor of employees in the prohibited group.[2]

## FINDINGS OF FACT

Most of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference.

Petitioner is a New York corporation which had its principal place of business at Utica, N. Y., at the time of the filing of the petitions herein. It filed its Federal income tax returns for the taxable years in question with the North Atlantic Service Center, Andover, Mass.

At all times pertinent, petitioner was in the commercial, industrial, and residential roofing and siding business.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, unless otherwise indicated.

[2] Respondent also determined a deficiency of $5,932 in petitioner's accumulated earnings tax for the taxable year ending Oct. 31, 1970, but the issue thus raised has now been conceded by petitioner.

During each of the taxable years involved, petitioner's president and sole stockholder was Owen J. Owens. Margaret Owens, his wife, was petitioner's secretary, and Richard Owens, their son, was its treasurer during each of these years. William Owens, another son, became petitioner's vice president during the fiscal year ending October 31, 1971, and continued to serve in that capacity through September 30, 1973.

Petitioner adopted a profit-sharing plan effective November 1, 1958, and simultaneously created a trust to receive the contributions to be made pursuant to the plan. On January 27, 1961, petitioner adopted the first amendment to its profit-sharing plan. The plan, as amended, provided for:

(1) Coverage for all employees except—

(a) Participants in a labor union pension, profit-sharing, or welfare plan, established through collective bargaining, to which petitioner makes contributions, and

(b) Employees who customarily work 20 or fewer hours per week or 5 or fewer months per calendar year;

(2) Contributions to the trust of a percentage of "net income" of petitioner as defined in the plan, up to, but not exceeding, 15 percent of the aggregate compensation of all participants in the plan;

(3) Full vesting upon retirement, disability, or death;

(4) Vesting where employment is terminated for other reasons, according to the following schedule:

| Years as member of plan | Vested interest (percent) |
|---|---|
| Less than 2 | 0 |
| At least 2 and less than 3 | 15 |
| At least 3 and less than 4 | 30 |
| At least 4 and less than 5 | 45 |
| At least 5 and less than 6 | 60 |
| At least 6 and less than 7 | 80 |
| 7 or more | 100 |

That portion of a participant's account not vested as of the time of termination is forfeited, deemed an additional contribution by petitioner, and allocated to the remaining participants in proportion to their compensation for the year of forfeiture.

On November 3, 1959, petitioner requested the District Director to determine whether the profit-sharing plan satisfied

the requirements of section 401(a). The tax information schedule attached to the request showed employee coverage for the fiscal year ending October 31, 1959, as follows:

Employees ineligible due
  to union membership ................................. 26
Employees ineligible due
  to minimum compensation[3] ........................ <u>41</u>
    Total ineligible employees ....................... 67

Eligible and covered .................................... <u>.9</u>
    Total employees ................................... 76

Relevant data contained in the information schedule concerning the eligible and covered employees was as follows:

| Name | Officer | Percent of stock ownership | Supervisory duties | Compensation |
|---|---|---|---|---|
| Owen Owens | Yes | 50 | Yes | $19,700.00 |
| Margaret Owens | No | 0 | Yes | 3,380.00 |
| Elizabeth Owens | Yes | 50 | Yes | 3,120.00 |
| John Burnett | No | 0 | No | 4,698.55 |
| Morris Park | No | 0 | Yes | 3,300.00 |
| David Thomas | No | 0 | No | 4,845.60 |
| Francis Alsante | No | 0 | No | 1,407.21 |
| Adam Kozinski | No | 0 | No | 1,964.56 |
| Robert Terry | No | 0 | No | 1,719.35 |

Respondent, on February 28, 1961, issued a letter stating that the trust was a qualified trust under section 401(a) and that it was exempt from income tax under section 501(a). This letter contained the following caveat:

Attention, however, is invited to section 1.401–1(b)(3) of the 1954 Regulations which states in part: "The law is concerned not only with the form of a plan but also with its effects in operation."

At the time the plan was adopted and during the early 1960's, the residential roofing business accounted for approximately one-half of petitioner's business. Subsequently, residential roofing accounted for a declining share of petitioner's operation, to the point that, during the taxable years involved herein, it represented less than 10 percent of the business. This decline

---

[3]A requirement that the employee earn at least $1,000 per fiscal year to become a participant was eliminated in the first amendment to the plan adopted on Jan. 27, 1961.

was due, in large part, to the tendency of residential roofers theretofore employed by petitioner to go into business for themselves.

Petitioner's employees who worked in the nonresidential portion of the business generally were not eligible to participate in the profit-sharing plan because of their participation in labor union pension plans. Residential roofers did not participate in such plans and were thus eligible to become members of petitioner's plan. The decline in petitioner's residential roofing business was accompanied by a decline in the number of roofers eligible to become members of the plan.

The participants in petitioner's profit-sharing plan during the taxable years at issue and their compensation[4] were as follows:

| | Taxable year ending | | | |
|---|---|---|---|---|
| Name | Oct. 31, 1970 | Oct. 31, 1971 | Oct 31, 1972 | Sept. 30, 1973[1] |
| Owen J. Owens | $52,700 | $56,200 | $56,800 | $67,500 |
| Margaret Owens | 10,350 | 10,700 | 10,900 | 12,600 |
| Richard Owens | 18,858 | 22,400 | 26,800 | 29,200 |
| William Owens | | 8,060 | 13,290 | 16,670 |
| Eleanor Miller | 5,010 | 7,460 | 2,300 | 924 |
| Nandor Sarus | | | 2,517 | --- |
| Philip Schremmer | | | 1,075 | --- |
| Isabelle Hoffman | | | 3,540 | --- |

[1] Petitioner changed its fiscal year in 1973.

Eleanor Miller and Isabelle Hoffman were employed in clerical positions. Philip Schremmer and Nandor Sarus were roofers.

Employees who participated in labor union pension plans were compensated as follows:

.

[4] It is stipulated that petitioners' nonunion employees consisted of corporate officers, clerical and sales personnel, siding men, and engineers, and that the total amounts paid to all nonunion employees exceeded the total amounts paid to pension plan participants. For the years ending Oct. 31, 1970 and 1971, it appears that some of the nonunion employees may have been part-time workers. There is nothing in the record to indicate why some nonunion employees appear to have been excluded from participation in the plan for the other years in issue. Nor does the record reveal the number of union personnel, if any, who were employed during the course of the years at issue herein but who were not eligible to participate in the union pension plans, presumably because they were part-time employees. Thus, a complete comparison is not possible between the composition of petitioner's total work force during fiscal 1959 and the years at issue.

| | *Number of employees* | | | |
|---|---|---|---|---|
| | *FYE Oct. 31,* | *FYE Oct. 31,* | *FYE Oct. 31,* | *FYE Sept. 30,* |
| *Compensation* | *1970* | *1971* | *1972* | *1973* |
| Less than $1,000 ....... | 19 | 17 | 14 | 16 |
| $1,000 to $2,000 ......... | 5 | 8 | 6 | – |
| $2,000 to $5,000 ......... | 3 | 6 | 3 | 6 |
| $5,000 to $8,000 ......... | 7 | 4 | 8 | 5 |
| $8,000 to $10,000 ....... | 4 | 6 | 5 | 2 |
| $10,000 to $15,000 ...... | 2 | 7 | 6 | 8 |
| More than $15,000 ..... | __ | 1 | 1 | 1 |
| Total[1] ................... | 40 | 49 | 43 | 38 |

[1]These totals conflict with the number of employees reported by petitioner on its income tax returns. Neither party has provided any explanation for this discrepancy.

Respondent determined in the notices of deficiency that the profit-sharing plan discriminated in favor of shareholders, officers, and highly compensated employees in violation of section 401(a)(3) and (4).

## OPINION

Petitioner seeks to deduct amounts contributed to a profit-sharing trust. Such deductions are allowed under section 404(a)(3) if the trust is exempt under section 501(a), which requires that the trust be a "qualified trust" as defined in section 401(a).[5]

---

[5]Sec. 401(a) provides in pertinent part:

SEC. 401(a). REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

\* \* \* \* \* \* \*

(3) if the trust, or two or more trusts, or the trust or trusts and annuity plan or plans are designated by the employer as constituting parts of a plan intended to qualify under this subsection which benefits either—

(A) 70 percent or more of all the employees, or 80 percent or more of all the employees who are eligible to benefit under the plan if 70 percent or more of all the employees are eligible to benefit under the plan, excluding in each case employees who have been employed not more than a minimum period prescribed by the plan, not exceeding 5 years, employees whose customary employment is for not more than 20 hours in any one week, and employees whose customary employment is for not more than 5 months in any calendar year, or

(B) such employees as qualify under a classification set up by the employer and found by the Secretary or his delegate not to be discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees; and

(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

Respondent contends that the profit-sharing plan failed to meet the coverage requirements of section 401(a)(3) because it discriminated in favor of the prohibited group, i.e., employees who are officers, shareholders, supervisors, or highly compensated. He also contends that the contributions and benefits under the profit-sharing plan discriminated in favor of the prohibited group within the meaning of section 401(a)(4).

Petitioner asserts that the change in plan coverage, subsequent to respondent's determination in 1961 that the plan was qualified, was produced by "unforeseen and uncontrollable changes in business activities" and that the revocation of the prior ruling was "an arbitrary and abusive exercise" of respondent's authority. Alternatively, it argues that the plan coverage in 1972 was virtually identical to the coverage at the time the plan was approved and, at least for that year, respondent's determination cannot be sustained. Finally, it disputes respondent's contention for nonqualification by virtue of the application of section 401(a)(4).

We address ourselves in the first instance to the question whether the petitioner's profit-sharing plan satisfies the *coverage* requirements of section 401(a)(3), an issue which is separate from that relating to the functioning of the plan in respect of contributions and benefits under section 401(a)(4). *Babst Services, Inc. v. Commissioner,* 67 T.C. 131, 136 (1976). It is apparent that the safe-harbor percentage test of section 401(a)(3)(A) has not been met. Accordingly, the issue before us as to coverage depends upon the applicability of section 401(a)(3)(B). Resolution of that issue is "a question of fact to be determined from all surrounding facts and circumstances." See *Loevsky v. Commissioner,* 55 T.C. 1144, 1149 (1971), affd. per curiam 471 F.2d 1178 (3d Cir. 1973), cert. denied 412 U.S. 919 (1973).

Initially, we observe that petitioner has abandoned its original contention that the profit-sharing and union plans should be treated as a combined plan which would satisfy the requirements of section 401(a), conceding that it has not demonstrated that the contributions and benefits under such a combined plan were not discriminatory, as required by section 401(a)(4). See *Liberty Machine Works, Inc. v. Commissioner,* 62 T.C. 621 (1974), affd. per curiam 518 F.2d 554 (8th Cir. 1975); *Loper Sheet Metal, Inc. v. Commissioner,* 53 T.C. 385 (1969). Such being the case, the question of discriminatory coverage under section 401(a)(3)(B) is

determined by taking the union employees into account and treating them as though they were not covered by any qualified plan. See *Babst Services, Inc. v. Commissioner, supra; Loevsky v. Commissioner, supra.* Petitioner argues that the amendment to subchapter D of chapter 1 of the Code contained in the Employee Retirement Income Security Act of 1974, Pub. L. 93–406, 88 Stat. 829, evidences a congressional intent to exclude certain groups of union members in determining whether plan coverage is discriminatory and that this intent should be given retroactive effect. We have recently reviewed this legislation and decided that it was to apply prospectively only. *Babst Services, Inc. v. Commissioner, supra* at 140–141. We therefore reject petitioner's contention that the union employees should not be considered.

Petitioner argues that its classification scheme is not discriminatory for purposes of section 401(a)(3)(B) because it was found to be nondiscriminatory in 1961 and that any change in plan coverage resulted from unforeseen external business conditions which were beyond its control, namely, the decline in its residential roofing activities and the consequent decrease in its nonunion employee work force and increase in the proportion of its union employees. Relying heavily on *Ryan School Retirement Trust v. Commissioner,* 24 T.C. 127 (1955), petitioner contends that, whenever a change in coverage is not foreseen, a plan previously considered qualified should be held not to lose its exempt status irrespective of any discrimination in coverage resulting from the change. See also *Sherwood Swan & Co. v. Commissioner,* 42 T.C. 299 (1964), affd. 352 F.2d 306 (9th Cir. 1965). Respondent counters with the assertion that the fact that discrimination is caused by unforeseen external factors is irrelevant in determining the exempt status of the profit-sharing plan. We reject both extreme positions.

At the outset, we note that failure to meet the requirements of section 401(a)(3)(B) is dispositive of this case. *Babst Services, Inc. v. Commissioner, supra* at 137 n. 7. Cf. *Lansons, Inc. v. Commissioner,* 69 T.C. 773, 781–782 n. 4 (1978). In determining whether this provision has been satisfied, we apply a two-part approach. First, we look to the effect of the coverage provisions in the years at issue, without consideration of the effect of such provisions in prior years. See *Wisconsin Nipple & Fabricating Corp. v. Commissioner,* 67 T.C. 490 (1976), on appeal (7th Cir.,

June 27, 1977). Second, in cases involving changes in coverage due to unforeseen circumstances, we analyze the effect of the provisions in both prior years and the years at issue to determine whether those changes were sufficient to justify the conclusion that respondent did not err in revoking his earlier determination. See pp. 1011–1014 *infra*. If we conclude that respondent so erred, then his earlier ruling is given effect, therby satisfying section 401(a)(3)(B).

As we see it, the standard for evaluating the plan's restrictions on eligibility under the first prong of this two-part test (i.e., coverage during the years at issue under section 401(a)(3)(B)) is the same as if the plan had been established during that period. In point of fact, this approach was taken in applying section 401(a)(4) (explicitly in *Ryan School*, see 24 T.C. at 133, and implicitly in *Sherwood Swan*, see 42 T.C. at 308) and was the foundation of our holdings that a bias in the operation of the plan in favor of permanent as against nonpermanent employees, which came about as a result of unforeseen circumstances, did not result in disqualification under that section. Similarly, in *Lansons, Inc. v. Commissioner, supra,* we dealt with the problem of coverage under section 401(a)(3)(B) in the context of the permanent-versus-nonpermanent classification, applied the unforeseen circumstances rationale of *Ryan School* and *Sherwood Swan* to that issue, and held that the classification used therein was nondiscriminatory both initially and during all subsequent years, including the years at issue.

We turn to an analysis of the facts respecting coverage under petitioner's profit-sharing plan.

There were four plan participants out of a total of 44 employees during fiscal 1970. Three were officers of the corporation and supervisory employees. Two of these were the most highly compensated employees and the third officer was the fifth most highly compensated.[6]

---

[6]Petitioner has failed to introduce evidence into the record concerning the number of employees participating in the union plan who were supervisors, as is its burden. Rule 142(a), Tax Court Rules of Practice and Procedure. Even had such evidence been presented, it is unlikely that the result would be affected, for "what is particularly significant for purposes of section 401(a)(3)(B) is not that some of the excluded employees may have been members of the prohibited group, but that of those employees permitted to participate in petitioner's plan, a disproportionate number, if not all, were members of that group." *Babst Services, Inc. v. Commissioner,* 67 T.C. 131, 139 (1976). Moreover, it is enough that the coverage discriminates in favor of some, rather than all, of the prohibited categories. *John Duguid & Sons, Inc. v. United States,* 278 F. Supp. 101 (N.D. N.Y. 1967).

There were five plan participants out of a total of 54 employees during fiscal 1971. Four were officers of the corporation and supervisory employees. Two of these were the most highly compensated and the third officer was the 10th most highly compensated. The fourth officer, William Owens, became an officer at some unspecified time during the year.

There were 8 plan participants out of a total of 51 employees in fiscal 1972. Four were corporate officers and supervisory employees. Again, 2 of these were the most highly compensated employees and the remaining 2 officers were among the 11 employees paid in excess of $10,000.

There were 5 plan participants out of a total of 43 employees in fiscal 1973. Four were corporate officers and supervisory employees. This group included the 2 most highly compensated and 4 of the 5 most highly compensated employees.

Thus, by the 4 years in issue, the total number of petitioner's employees (insofar as can be gleaned from the record herein, see n. 4 *supra*), had dropped substantially from the 76 employed in 1959. Moreover, in 3 of those years, at least 75 percent of the plan participants were officers and supervisory employees, and, in the remaining year, 50 percent of the participants were in those categories. In addition, the officers tended to be among the most highly compensated employees.[7] In each of the years, 100 percent of petitioner's officers participated in the plan, whereas less than 3 percent of the other employees were covered in 1970, 1971, and 1973 and approximately 8.5 percent were covered in 1972. It is apparent, therefore, that the eligibility criteria involved herein favored the prohibited group. *Wisconsin Nipple & Fabricating Corp. v. Commissioner*, 67 T.C. 490 (1976).

This discrimination is not "excused" because of the inability of petitioner to include the union members in its plan. *Loevsky v. Commissioner*, 55 T.C. 1144 (1971). By the same token, the absence of any evidence of an intent to siphon off profits to the prohibited group is not determinative. *Greenwald v. Commissioner*, 366 F.2d 538, 540 (2d Cir. 1966), affg. as to this issue 44 T.C. 137 (1965); *John Duguid & Sons, Inc. v. United States*, 278 F. Supp. 101, 104 (N.D.N.Y. 1967).

Based upon the foregoing, we think it clear that, since the

---

[7] In fiscal 1970, three of the participant officers were the sole shareholder, his wife, and one son, and in the other fiscal years another son was added to the group.

plan would violate the coverage requirements of section 401(a)(3)(B), as an a priori proposition and without regard to respondent's prior ruling, petitioner would not be entitled to deductions for contributions thereto during the years in issue.

This brings us to the second part of our analysis, relating to the effect of unforeseen circumstances on respondent's right to revoke his prior ruling. Respondent has publicly announced that a ruling will, in the absence of unusual circumstances, not be revoked retroactively. Statement of Procedural Rules, 26 C.F.R. sec. 601.201 (1977); Rev. Proc. 67-1, sec. 13.05, 1967-1 C.B. 544, 553. At the same time, it is clear that respondent has the statutory authority to revoke a ruling retroactively. Sec. 7805(b). It is equally clear that such a revocation will not be disturbed unless respondent has abused his discretion, and we are clearly precluded from using a standard for decision which would impose on petitioner only the usual burden of proof by a preponderance of the evidence, or which would substitute our judgment for the respondent's. *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180 (1957); *Lowry Hospital Association v. Commissioner*, 66 T.C. 850, 860 (1976). See also *Commissioner v. Pepsi-Cola Niagara Bottling Corp.*, 399 F.2d 390, 393 (2d Cir. 1968), revg. 48 T.C. 75 (1967). Petitioner's attempt to distinguish the cases where respondent's position was sustained, merely on the ground that those cases did not involve a prior favorable ruling, falls by the wayside in light of *Wisconsin Nipple & Fabricating Corp. v. Commissioner, supra,* where respondent's subsequent revocation of such a ruling was upheld. The fact that respondent might have proceeded in a gentler fashion, by giving petitioner a more formal notice of his proposed revocation prior to the issuance of the deficiency notice, does not justify a rejection of the revocation itself.[8]

Thus, the bottom line of this case is whether *Ryan School Retirement Trust v. Commissioner*, 24 T.C. 127 (1955), *Sherwood Swan & Co. v. Commissioner*, 42 T.C. 299 (1964), and *Lansons, Inc. v. Commissioner*, 69 T.C. 773 (1978), should be applied, on the ground, as petitioner contends, that the changes in circumstances subsequent to the issuance of the ruling and prior to the years in issue were unforeseen. We have already noted that, in

---

[8]We note that respondent's original ruling put petitioner on notice that the operation of the plan had to continue to conform to the statutory requirements. See p. 1004 *supra.*

all three of these cases, we held that the plan in question was not discriminatory during the years therein at issue—a fact which distinguishes them from the instant case. However, it cannot be gainsaid that, when we extended the unforeseen circumstances rationale to the question of coverage in *Lansons* we rejected the concept that "a discriminatory classification * * * [is] one that, however reasonable its eligibility requirements at the outset, later results in a difference in coverage in favor of the prohibited group." See 69 T.C. at 783.

However, we are of the opinion that *Lansons* cannot fairly be read as articulating an absolute rule of law that a plan once qualified under section 401(a)(3)(B) remains qualified irrespective of any change in circumstances so long as the change was unforeseen. Indeed, such a rule of law would go too far, in light of the plain meaning of the statute. See *Container Service Co. v. United States*, 345 F. Supp. 235, 240 (S.D. Ohio 1972), affd. 478 F.2d 770 (6th Cir. 1973); *Loevsky v. Commissioner*, *supra* at 1151–1152. Nor do we think that petitioner's position can be salvaged by interpreting *Lansons* to stand for a more limited proposition that unforeseen circumstances, whatever their effect on a prospective revocation of a prior ruling by respondent, *necessarily* precludes a retroactive revocation.[9] In the first place, it is far from clear that *Lansons* announces any such proposition, since the unforeseen circumstances rationale was relied upon primarily in holding that the plan in that case actually qualified during the years therein at issue. In the second place, even assuming that *Lansons* adopts such a proposition, we do not believe it would extend to the instant case. Our concern in *Lansons* was that minor year-to-year fluctuations in coverage due to extraneous factors would result in a plan being qualified in one year and nonqualified in the next, without the slightest change of a permanent nature. Such is not the situation herein, where there was a permanent change in the character of petitioner's business and the composition of its work force (see pp. 1013–1014 *infra*)—changes as to which respondent can hardly have been said to have been on notice[10]—to say nothing of the fact

---

[9]We recognize that unforeseen circumstances were not present in *Wisconsin Nipple & Fabricating Corp. v. Commissioner*, 67 T.C. 490 (1976), on appeal (7th Cir., June 27, 1977).

[10]Schedules 2950 attached to petitioner's 1970 and 1971 tax returns did no more than submit numbers of employees in various categories and financial information relating to their compensation and accounts under the plan. The Schedule 2950 attached to the 1972 return did no more than indicate

that the claimed unforeseen circumstances developed prior to the taxable years at issue herein (see below and p. 1014).

As we see it, the claimed unforeseen circumstances must be evaluated in that context and in light of the circumstances of the particular case and it is to that valuation, based on the record herein, that we now turn our attention.

Initially, we note that the record herein shows that the change in the character of petitioner's business and its employee distribution from that which existed when the plan was first adopted in 1959 in fact occurred at a point in time substantially prior to the first taxable year in issue herein. It is far from clear to us that such changes were not capable of being foreseen and that consequently petitioner might well have been in a position to make adjustments in the contributions formula or to equalize benefits in either the plan involved herein or the union pension plans which would have enabled it to have those plans considered in combination and thereby satisfy the requirements of section 401(a). See *Babst Services, Inc. v. Commissioner*, 67 T.C. 131 (1976). See also *Greenwald v. Commissioner*, 366 F.2d at 541.[11]

Evaluating the specifics of the changes involved in the instant case, it is clear that there was a substantial change in petitioner's business of a permanent nature. At the time petitioner sought the initial determination, residential roofing was a major portion of its business. The effect of excluding union members from the plan in such circumstances would not necessarily be discriminatory, for the covered employees may have, at that time, been a representative cross section of all employees. See *John Duguid & Sons, Inc. v. United States*, 278 F. Supp. at 104. See also Rev. Rul. 70–200, 1970–1 C.B. 101. The residential roofing portion of petitioner's business declined over the years until it became a minor part of its operations. As it declined, so did the number of nonunion employees who were outside of the prohibited group. The ramification of this decline

---

the existence of the plan and the name and address of the fiduciary and there was no Schedule 2950 (or comparable information) included with the 1973 return.

[11]Initially, petitioner argued that if the profit-sharing and union plans were treated as a single plan (see *Liberty Machine Works, Inc. v. Commissioner*, 62 T.C. 621 (1974), affd. 518 F.2d 554 (8th Cir. 1975)), the resulting plan would satisfy the requirements of sec. 401(a). In its reply brief, petitioner conceded that it has not demonstrated that contributions and benefits under the combined plan were not discriminatory as is required by sec. 401(a)(4). See *Loper Sheet Metal, Inc. v. Commissioner*, 53 T.C. 385 (1969).

became apparent during the taxable years involved herein and perhaps earlier. During 3 of these years, only one plan participant was not a member of the prohibited group. During the fourth year, four participants were not members of the prohibited group, but three of these were not participants in the following year.

In 1959, slightly more than 7 percent of the employees in the nonprohibited group were covered, whereas in the years before us less than 3 percent of those employees were covered in 1970, 1971, and 1973 and approximately 8.5 percent in 1972. At least as to the 3 former years, there was a substantial drop in these percentages, i.e., roughly 60 percent. The comparable contrasting percentage change in officer coverage from 1959, on the one hand, and the years in issue, on the other, is zero—the percentage of officer coverage remained at 100 percent. The shift in petitioner's business, together with the resulting alteration in the composition of the pool of eligible employees and the substantial drop in the percentage of covered employees in the nonprohibited group, was a sufficient change of circumstances to justify respondent's action, at least as to 1970, 1971, and 1973. Cf. *Christian Echoes National Ministry, Inc. v. United States*, 470 F.2d 849, 858 (10th Cir. 1972).

In *Ryan School, Sherwood Swan,* and *Lansons,* neither the character of the taxpayer's business nor the essential composition of its work force changed.[12] In short, these cases are also distinguishable in the context of the issue of the validity of respondent's retroactive revocation of the ruling issued to petitioner in 1959.

Petitioner's reliance on *H.S.D. Co. v. Kavanagh,* 191 F.2d 831 (6th Cir. 1951), is misplaced. That case involved an attempt by a new Commissioner of Internal Revenue to revoke a prior ruling where there had been no change whatsoever in the facts and, at most, a mistaken inference drawn from the facts. See *Wolinsky v. United States,* 271 F.2d 865, 868 n. 1 (2d Cir. 1959).

Nor are we convinced that the result should be different for 1972. During that year, four of the eight plan participants were members of the prohibited group and four were not members, out of a total of 51 employees. At the time the plan was adopted,

---

[12]We also note that, in *Lansons,* we did no more than recognize that *Ryan School* retained its vitality in cases involving the failure to cover nonpermanent employees. See *Lansons, Inc. v. Commissioner,* 69 T.C. 773, 785 (1978).

there was a total of 76 employees and, of the nine plan participants, four were in the prohibited group. As we have previously noted, the percentage of covered employees in the nonprohibited group actually increased from slightly less than 7 percent to approximately 8.5 percent. Based solely on the naked figures, there does not appear to be a great deal of difference in the effect of the coverage provisions in 1972 and at the time the plan was adopted.[13] But 1972 is not the first year subject to the revocation of qualification (in which event it might be argued that it was a transition year). Rather, it follows 2 years during which the prohibited classification already existed. Moreover, the three persons who became covered by the plan in 1972 obviously were only employed for a very short period.

Under all the circumstances herein and giving particular attention to the material change in petitioner's business, we are satisfied that petitioner should not be able, on the basis of happenstance of substantial identity or slight variations in numbers, to cause its plan, which has already lost its qualification for the 2 years prior to 1972 and the subsequent year, to rise phoenix-like from the ashes of such disqualification and become qualified for that year. Such a result would produce a fluctuating situation comparable to that arising from minor fluctuations in a taxpayer's normal work force which we found unacceptable in *Lansons*. Nothing in *H.S.D. Co. v. Kavanagh,* see p. 1014 *supra,* mandates a different conclusion.

In sum, we hold that petitioner's plan discriminated in coverage within the meaning of section 401(a)(3)(B). In view of this conclusion, we need not reach the alternative issue, raised by respondent, as to whether the contributions and benefits under the plan were discriminatory within the meaning of section 401(a)(4).

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

CHABOT, *J.,* concurring: I agree with the holdings in the

---

[13]We note that the number of officers and supervisory employees had increased from three to four and the number of highly compensated employees had increased from one to four.

opinion of the Court. However, a few additional comments may be appropriate.

*Firstly:* Judge Wilbur's dissenting opinion focuses on "the virtually identical circumstances existing in 1972 and 1959." He concludes that "it was an abuse of respondent's discretion to retroactively revoke his ruling." I gather that, under this approach, the circumstances in 1970, 1971, and 1973 are regarded as sufficiently different from the circumstances represented in 1959 so as to justify a conclusion that the respondent's revocation as to 1970, 1971, and 1973 was not an abuse of respondent's congressionally authorized discretion to apply rulings without retroactive effect.[1]

If 1970 and 1971 (the years to which the first deficiency notice related) were the only years before us, then (under this approach) the retroactive revocation would be upheld. Alternatively, if 1973 were the earliest year as to which the favorable determination letter was revoked, then (under this approach) the retroactive revocation would be upheld. The curative powers of 1972 must be remarkable if somehow 1972 can salvage the other 3 years.

*Secondly:* In 1972, 100 percent (4 out of 4) of the corporate officers and supervisory employees were participants in the profit-sharing plan, while less than 9 percent (4 out of 47) of the other employees were participants. In 1972, the plan covered $66\frac{2}{3}$ percent (2 out of 3) of employees with compensation of more than $15,000, and only $12\frac{1}{2}$ percent (6 out of 48) of employees with compensation of less than $15,000.

Combining the various categories of "prohibited group" employees, it appears that 80 percent (4 out of 5) of the prohibited group were covered, while less than 9 percent (4 out of 46) of the rank-and-file employees were covered.

This substantial disparity is clearly sufficient for us to hold that respondent correctly determined that for 1972 the coverage classification discriminated "in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated

[1] SEC. 7805. RULES AND REGULATIONS.

(b) RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

employees." This violates the requirements of section 401(a)(3)(B), as then in effect.[2] Since the standards of the statute were not met as to 1972, that year's circumstances cannot operate to salvage qualified status with respect to the other years before us.

*Thirdly:* Predictability in this area is largely a function of the statute and of the way this Court and other courts interpret the law. An erroneous interpretation of the law can be corrected. The taxpayer cannot rely on the courts to so strong-arm the statute (see n. 1 *supra;* n. 5 in the opinion of the Court, *supra*) as to perpetuate or revive the erroneous interpretation.

---

The prudent course, if dividing lines are unclear, is to avoid coming too close to the dividing lines or, alternatively, to keep careful current records, and to recognize that each year's status may depend upon that year's circumstances. See sec. 401(a)(6).[3]

*Fourthly:* A plan's classification can fail to meet the breadth-of-coverage requirements of section 401(a)(3) because of the operation of the plan even though there is no evil intent. It is too late in the day to challenge that concept. This has been made clear in many cases, notably (for purposes of the issues now before us) in *Loevsky v. Commissioner,* 55 T.C. 1144 (1971) (reviewed by the Court, three dissents), affd. per curiam 471 F.2d 1178 (3d Cir. 1973), cert. denied 412 U.S. 919 (1973); *Babst Services, Inc. v. Commissioner,* 67 T.C. 131 (1976) (reviewed by the Court, two dissents).

The fact that certain classifications are not discriminatory per se does not result in the conclusion that those classifications are permissible per se. It should be noted that section 401 (a)(3)(A) (subsequently transferred by ERISA, with modifications, to sec. 410(b)(1)), set forth in footnote 5 in the opinion of the Court, *supra,* specifically authorized exclusion of new employees, temporary employees, and part-time employees for purposes of applying the 70–80 percent tests; no such exclusion was

---

[2]Substantially the same requirements now appear in sec. 410(b)(1)(B), as a result of amendments made by the Employee Retirement Income Security Act of 1974 (hereinafter sometimes referred to as ERISA) (Pub. L. 93–406, 88 Stat. 900). The 1974 amendments do not apply to the years before us in this case. Sec. 1017, ERISA (88 Stat. 932).

[3]SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS.

(a) REQUIREMENTS FOR QUALIFICATION.— * * *

  *       *       *       *       *       *       *

(6) A plan shall be considered as meeting the requirements of paragraph (3) during the whole of any taxable year of the plan if on one day in each quarter it satisfied such requirements.

authorized by the statute for purposes of applying the discriminatory classification test of section 401(a)(3)(B).[4]

*Fifthly:* Section 401(a)(4)[5] is not an alternative way of dealing with discriminatory coverage. That provision generally[6] tests discrimination only as among those who are participants in the plan. See Rev. Rul. 68–301, 1968–1 C.B. 161; Rev. Rul. 76–250, 1976–2 C.B 124.

*Sixthly:* As to me, at least, the citation in the opinion of the Court to *Christian Echoes National Ministry, Inc. v. United States*, 470 F.2d 849, 858 (10th Cir. 1972), does not imply approval or disapproval of the tests used by the courts in that opinion or in any of the proceedings leading to that opinion. See sec. 1307(a)(3), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1722; H. Rept. 94–1210 (to accompany H.R. 13500), pp. 16–17 (1976), 1976–3 C.B. (Vol. 3) 46–47; S. Rept. 94–938 (Part 2), p. 84 (1976), 1976–3 C.B. (Vol. 3) 726; S. Rept. 94–1236 (H. Rept. 94–1515), pp. 532–534 (1976), 1976–3 C.B. (Vol. 3) 936–938; General Explanation of the Tax Reform Act of 1976 (Joint Committee on Taxation), pp. 415–416 (1976).

SIMPSON, *J.*, agrees with this concurring opinion.

DRENNEN, *J.*, dissenting: I respectfully dissent from the majority opinion which approves what was in effect respondent's retroactive revocation of his ruling that the profit-sharing plan here involved qualified under the provisions of section 401(a)(3), I.R.C. 1954.

---

[4]As a result of ERISA, sec. 410(b)(2)(A) now does permit exclusion of union groups (under certain circumstances) for purposes of the discriminatory classification test. However, that provision does not apply to the years before us in this case. See n. 2 *supra.*

[5]SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS.

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

\*       \*       \*       \*       \*       \*       \*

(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

[6]The only exception to that rule is where "the plan integrates with a governmental program such as the Social Security Act or the Railroad Retirement Act." Rev. Rul. 68–301, 1968–1 C.B. at 162. In such a situation, the contributions or benefits under the governmental program are taken into account even as to those integrated out of the private plan, in order to determine if the private plan satisfies the antidiscrimination requirements of sec. 401(a)(4).

Petitioner's profit-sharing plan was adopted in 1958 and was amended in 1961. Under the plan as amended all employees were eligible to participate except:

(1) Participants in the labor union pension plan, established through collective bargaining, to which petitioner makes contributions, and

(2) Employees who customarily work 20 or fewer hours per week or 5 or fewer months per year.

At the time the profit-sharing plan was adopted, petitioner had 76 employees, 26 of whom were ineligible due to union membership and 41 of whom were ineligible due to minimum compensation.[1] The remaining nine employees were eligible and covered. Of those covered two were stockholders, four (including the stockholders) were supervisory employees, and the compensation ranged from $1,719 to $3,380, except for the chief executive officer, whose compensation was $19,700. On February 28, 1961, respondent issued a letter stating that the profit-sharing trust qualified under section 401(a), I.R.C. 1954.

Due to changing conditions in petitioner's business in the mid or later 1960's, there was a decline in the number of petitioner's nonunion employees eligible to participate in the plan. As a result there were four employees covered by the plan for fiscal 1970, five for 1971, eight for 1972, and five for 1973. There is no finding with regard to the number of nonunion employees, if any, that were not eligible to participate in the years in issue because of the part-time and minimum hours provisions. Of the covered employees, only one in 1970 and 1973, two in 1971, and four in 1972 were paid less than $10,000, but in all 4 years, one was paid only slightly more than $10,000. Three of the covered employees were officers of petitioner in 1970 and a fourth became an officer in 1971.

In the notices of deficiency issued in 1975 and 1976 respondent determined that the profit-sharing plan discriminated in favor of the prohibited group for each of the years 1970–73 in violation of section 401(a)(3) and (4) of the Code. The majority concluded that the classification set up by the petitioner and previously found by the respondent to be nondiscriminatory had become

---

[1] A $1,000 minimum compensation requirement was eliminated by the 1961 amendment. The findings of fact do not reveal how many employees would have been eligible and covered without the minimum compensation requirement, but there would have been at least the same nine.

discriminatory in operation for the years in issue under section 401(a)(3)(B), and found no need to consider section 401(a)(4).

My principal objection to the majority view is that it approves a *retroactive* revocation of a ruling that the plan was qualified because unforeseen changing conditions in petitioner's business which were beyond petitioner's control reduced the number of employees not in the prohibited class who were eligible to participate. I will discuss this more in detail later.

But at the outset I should state that I fail to understand how the *classification* set up by the petitioner, which was approved by respondent and remained unchanged, could in and of itself have become discriminatory, or how petitioner could have changed it in any reasonable way that would not have produced the same alleged discrimination. Section 401(a)(3)(B) relates to eligibility for coverage; section 401(a)(4) relates to discrimination by virtue of contributions and benefits. Perhaps a perusal of this plan during the years in issue under section 401(a)(4) would better justify a finding of discrimination, see *Bernard McMenamy, Inc. v. Commissioner*, 54 T.C. 1057 (1970), affd. 442 F.2d 359 (8th Cir. 1971), but the majority found it unnecessary to follow that course. The classification set up by petitioner made ineligible only those employees who were members of the union and presumably eligible for coverage under the union plan to which petitioner contributed, or were employees who customarily worked not more than 20 hours per week or not more than 5 months in a calendar year. Certainly neither of these requirements is discriminatory per se. Section 401(a)(3)(A) recognizes that part-time employees need not be considered in the head count. And respondent's original ruling in this case recognized that exclusion of the union members was not discriminatory. See also sec. 401(a)(5).[2] Yet under the majority opinion petitioner could not have adopted a classification for its nonunion employees that excluded part-time employees without being discriminatory.

The majority suggests that petitioner might have made adjustments in the contributions formula or to equalize benefits in either this plan or the union plan which would have enabled it

---

[2]Sec. 401(a)(5) provides:

A classification shall not be considered discriminatory * * * merely because it is limited to salaried or clerical employees. * * *

to have the two plans considered in combination and thereby satisfy the requirements of section 401(a). As noted before, an analysis of contributions and benefits seems to me to be a function of section 401(a)(4) which the majority failed to consider. But in any event, the union plan was a negotiated plan and petitioner could not change it ex parte. Yet the majority concludes that the union members must be considered in determining whether there was discrimination in favor of the prohibited group just as though they were not covered by any plan. Consequently, under the majority opinion, petitioner could not have a qualified plan for its *regular nonunion* employees. I do not believe Congress intended any such result when it provided in section 401(a)(3)(B) that an employer who did not meet the head count under section 401(a)(3)(A) could still have a plan that qualified by establishing a *classification* that is not discriminatory. See *Lansons, Inc. v. Commissioner*, 69 T.C. 773, a Court-reviewed opinion of this Court released February 27, 1978; *Sherwood Swan & Co. v. Commissioner*, 42 T.C. 299 (1964); *Ryan School Retirement Trust v. Commissioner*, 24 T.C. 127 (1955).

Turning now to the principal disagreement I have with the majority opinion, I think it was arbitrary and unreasonable for respondent to, in effect, retroactively revoke his favorable ruling in this case. The majority, in discussing its two-part approach to the issue in this case, says that (secondly) in cases involving changes in coverage due to unforeseen circumstances, we analyze the effect of the provisions in both prior years and the years in issue to determine whether those changes were sufficient to justify the conclusion that respondent did not err in revoking his earlier determination. I believe, under the circumstances of this case, that the last clause of the above sentence should read, "did not err in *retroactively* revoking his earlier determination." See *Lansons, Inc. v. Commissioner, supra.*

The question is not whether respondent has the authority to retroactively revoke his ruling. I recognize that he has that authority. Sec. 7805(b), I.R.C. 1954. The question is whether he abused that authority in this case. I would hold that he did. As the majority recognizes, respondent has publicly announced that a ruling will, in the absence of unusual circumstances, not be retroactively revoked. See Statement of Procedural Rules, 26 C.F.R. sec. 601.201 (1977); Rev. Proc. 67–1, sec. 13.05, 1967–1 C.B. 544, 553. What are the unusual circumstances here that justify a

retroactive revocation? I perceive none, and the majority points to none.

Petitioner had established its profit-sharing plan in 1958 and relied on respondent's favorable ruling for at least 14 years (1961–75). Suddenly, in a notice of deficiency issued in 1975, respondent decided to change his position with respect to qualification of this plan as of 1970. The discrimination that the majority finds was admittedly the result of changing conditions in petitioner's business. The majority suggests that petitioner could have foreseen the change and should have amended (or abandoned) its plan. It is not clear when the changes became so pronounced as to produce the so-called discrimination in this plan—but apparently it was not until shortly before the first year in issue here, 1970. But was the change of such certain permanency to justify amending the plan? As pointed out in Judge Wilbur's dissenting opinion, the classification produced no more discrimination in 1972 than it did in 1961. Is an employer expected to amend the *classification* in his plan every year to meet changing conditions, whether permanent or not? And more in point, is the respondent justified in changing his position retroactively without discussing possible amendments to the plan with the employer first? So far as we know there was no material misstatement or omission of any facts on which the ruling was based, there was no change in the law, petitioner had acted in good faith in reliance on the prior ruling, and there was apparently no evidence of an intent to siphon off profits to the prohibited group. While none of these factors individually may be determinative, I believe they all should be given consideration in determining whether respondent's action was arbitrary.

The reason for respondent's announced position in Rev. Proc. 67–1, *supra,* is to provide some certainty for taxpayers and permit them to rely on respondent's rulings. Without such assurance there would be little reason to obtain a ruling. This is particularly true in the pension and profit-sharing area where a taxpayer's good faith reliance on a ruling that his plan is qualified will produce unfavorable tax consequences not only to the taxpayer but others as well if the ruling is retroactively changed. Here, the result of respondent's change in position makes the profit-sharing trust subject to tax, disallows to petitioner a deduction for part of its contributions to the trust,

and subjects the participating employees to tax on a part of the contributions made in their behalf.

I realize that respondent's revocation should not be disturbed unless he has clearly abused his discretion, but I think the courts have a right to make that determination. In this instance, I would conclude that respondent's retroactive revocation was arbitrary and an abuse of his discretion. See *Lansons, Inc. v. Commissioner, supra.*

In closing I will add that, despite much language in the majority opinion attempting to distinguish it, I do not find this case distinguishable from *Lansons, Inc. v. Commissioner, supra,* particularly in the conceptual approach to determining whether respondent's retroactive revocation of a favorable ruling on a pension plan was arbitrary. Yet that case was decided just 5 months ago in a Court-reviewed opinion of this Court.

FAY, STERRETT, GOFFE, HALL, WILES, and WILBUR, *JJ.,* agree with this dissenting opinion.

WILBUR, *J.,* dissenting: In view of the impact of unforeseen changes on petitioner's work force shortly before the years in issue, the similarity of the coverage in 1959 and the years before us, and the virtually identical circumstances existing in 1972 and 1959, I believe it was an abuse of respondent's discretion to retroactively revoke his ruling. I note with interest that the majority resorts to Greek mythology to explain away the virtually identical circumstances existing in 1972 and 1959. This identity of circumstances is described in unmistakably clear language in the majority's opinion.

During that year [1972], four of the eight plan participants were members of the prohibited group and four were not members, out of a total of 51 employees. At the time the plan was adopted, there were a total of 76 employees, and of the nine plan participants, four were in the prohibited group. As we have previously noted, the percentage of covered employees in the non-prohibited group actually increased from slightly less than 7 percent to approximately 8.5 percent. Based solely on the naked figures, *there does not appear to be a great deal of difference in the effect of the coverage provisions in 1972 and at the time the plan was adopted.* * * * [Fn. ref. omitted. Emphasis added.]

That statement is unduly cautious; candor requires the conces-

sion that, for purposes of the relevant criteria, the 2 years are virtually identical.[1]

Respondent is not estopped to correct what he determines to be a prior error, and in doing so he is entitled to reach opposite conclusions as to identical situations. But when the opposite result is incorporated in a prior ruling to the same taxpayer, acquired in good faith without any misrepresentation of any kind, he must do it prospectively. Otherwise a ruling means nothing and respondent can exercise his discretion without any bounds.

Respondent has assured all taxpayers that under these circumstances rulings will not be revoked retroactively "except in rare or unusual circumstances." Rev. Proc. 67–1, 1967–1 C.B. 544, 553. If respondent can ignore his own ruling and is not held to account even for a flagrant abuse of discretion, he has no incentive to properly evaluate the original request for a ruling, and predictability evaporates in the fog of an inordinately complex law. This is particularly unfortunate since the Employee Retirement Income Security Act of 1974 (ERISA) has introduced enormous complexity in the pension trust area, both conceptually and administratively, magnifying the need for certainty.

DRENNEN, FAY, GOFFE, HALL, and WILES, *JJ.*, agree with this dissenting opinion.

---

[1]Apparently, if 1972 were the first year before the Court, the majority would conclude that the revocation was an abuse of discretion as to that year. Additionally, if 2 of the 4 years were identical to 1959, the majority opinion implies that a different result might be in order. And clearly, if 3 of the 4 years were identical, the taxpayer would win, since, to use the majority's mythological metaphor, the fourth year could not "rise phoenix-like from the ashes" and contaminate the others. I see no point in playing a numbers game that makes a 2 to 2 as opposed to a 3 to 1 split among the years (or the sequence of their occurrence) dispositive. When viewed in light of the relevant statutory criteria, none of the years before the Court are markedly dissimilar from 1959, and 1972 is virtually identical with 1959.