**SOL WALKER & COMPANY**

v.

**The UNITED STATES.**

**No. 414–78.**

United States Court of Claims.

Oct. 22, 1980.

Stephen L. Pankau, Tampa, Fla., attorney of record, for plaintiff. Stanley W. Rosenkranz and MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., of counsel.

Donald P. Lan, Jr., Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser and Gilbert W. Rubloff, Washington, D. C., of counsel.

Before SKELTON, Senior Judge, and KASHIWA and BENNETT, Judges.

## OPINION

KASHIWA, Judge:

The plaintiff, Sol Walker & Company, is the sponsor of a profit–sharing plan. The issue is whether the trust created to administer the profit–sharing plan lost its tax–exempt status in 1969 due to discrimination in operation proscribed by I.R.C. § 401(a)(4)[1] in favor of the plan participants who are members of the prohibited group.[2] All relevant facts have been stipulated and we have heard oral argument. We conclude that in 1969 there was no discrimination proscribed by section 401(a)(4), and accordingly we hold for plaintiff.

Sol Walker & Company operates a scrap metal yard in Tampa, Florida. Sol Walker (Walker) and Irving Oster (Oster), who are stepbrothers, each owned 50 percent of the outstanding stock of plaintiff until Oster retired in 1969. Pursuant to a stock redemption agreement of July 3, 1958, plaintiff purchased Oster's stock at his retirement. Prior to 1969, Walker served as president and Oster as secretary–treasurer of plaintiff. The executive and managerial functions of plaintiff were performed solely by Walker and Oster up to 1969.

In December 1961, plaintiff adopted a profit–sharing plan (the plan), effective January 1, 1961. The Sol Walker & Company Profit–Sharing Trust (the trust) was created to administer the plan. Coverage was extended to individuals employed on the last business day of the year with at least 13 weeks of service. Plaintiff's annual contributions to the trust were stipulated percentages of its income above designated figures. These employer contributions were allocated among participants in the same proportion each participant's current salary bore to the current salary of all participants.

There was no vesting of interests within the first two years of participation; thereafter vesting occurred at a rate of 15 percent of the participant's account balance during the third year, an additional 5 percent per year through the tenth year, then 10 percent per year until 100 percent vesting occurred after 15 years of participation. If an employee terminated his employment prior to complete vesting, the nonvested portion was forfeited; such forfeitures were allocated to the remaining plan participants in proportion to a participant's account balance at the beginning of the year in which the forfeitures occurred.

Plaintiff's plan received a favorable determination letter from the Internal Reve-

---

1. "SEC. 401. QUALIFIED PENSION, PROFIT–SHARING, AND STOCK BONUS PLANS.

"(a) *Requirements for Qualification.–A trust created or organized in the United States and forming part of a stock bonus, pension, or profit–sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section–*

\* \* \* \* \* \*

"(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees." All references are to the Internal Revenue Code of 1954, as in effect in 1969.

2. The prohibited group (*i. e.*, those persons whom the plan may not discriminate in favor of) consists of "officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees."

nue Service (the Service), issued February 7, 1962. This letter stated the trust qualified under section 501 as a tax—exempt organization. Thereafter, through 1970,[3] plaintiff made contributions to the trust in accordance with the provisions of the plan.

Employee turnover was a problem for plaintiff. The plan was adopted to encourage longevity of employment and also to prevent unionization. However, even after the adoption of the plan, employee turnover was reasonably large.

Listed below is the number of full—time employees of plaintiff from the year before the plan was effective through the year following the year in issue.

| TAXABLE YEAR | NUMBER OF FULL-TIME EMPLOYEES AS OF THE END OF THE TAXABLE YEAR* | NUMBER OF EMPLOYEES FOR WHOM CONTRIBUTIONS WERE MADE |
|---|---|---|
| 1960 | 55 | No Plan |
| 1961 | 58 | 54 |
| 1962 | 52 | 51 |
| 1963 | 57 | 52 |
| 1964 | 70 | 55 |
| 1965 | 67 | 51 |
| 1966 | 68 | 60 |
| 1967 | 83 | Minimum level of Profit not met |
| 1968 | 69 | 63 |
| 1969 | 76 | 67 |
| 1970 | 74 | 69 |

*Due to the death, disability or retirement of employees during the year, contributions were allocated to some employees who were not employed as of the end of the taxable year.

The following table lists the number of employee terminations during the years 1962 through 1970, with the reason, if available, therefor.

| TAXABLE YEAR | TOTAL TERMINATION | RESIGNATIONS OF AN EMPLOYEE | DISCHARGE OF AN EMPLOYEE | OTHER REASONS |
|---|---|---|---|---|
| 1962 | 48 | Not Available | Not Available | Not Available |
| 1963 | 43 | Not Available | Not Available | Not Available |
| 1964 | 84 | Not Available | Not Available | Not Available |
| 1965 | 71 | Not Available | Not Available | Not Available |
| 1966 | 76* | 70 | 7 | None |
| 1967 | 77 | 65 | 12 | None |
| 1968 | 67 | 58 | 6 | 3 |
| 1969 | 90 | 77 | 9 | 4 |
| 1970 | 158 | 124 | 31 | 3 |

*The court notes an apparent error in the stipulation but was unable to determine which statistic was erroneous.

The number of employees working for plaintiff as of December 31, 1969, and the

3. No contributions were made in 1967 because the plan's required minimum profit level was not met.

4. "Integration" refers to taking into account contributions and benefits under the Social Security Act in determining whether the plan is discriminatory. The parties have stipulated

year of their initial employment are listed below:

| YEAR EMPLOYMENT BEGAN | NUMBER OF EMPLOYEES |
|---|---|
| 1969 | 25 |
| 1968 | 8 |
| 1967 | 9 |
| 1966 | 4 |
| 1965 | 6 |
| 1964 | 2 |
| 1963 | 4 |
| 1962 | 4 |
| 1961 | 1 |
| 1960 and earlier | 13 |

The operation of the plan for the years 1968 and 1970 has been treated by defendant as nondiscriminatory. The number of plaintiff's employees as of December 31, 1968, and December 31, 1970, and the year of their initial employment, is as follows:

### Employees as of December 31, 1968:

| YEAR EMPLOYMENT BEGAN | NUMBER OF EMPLOYEES |
|---|---|
| 1968 | 12 |
| 1967 | 15 |
| 1966 | 7 |
| 1965 | 9 |
| 1964 | 2 |
| 1963 | 4 |
| 1962 | 5 |
| 1961 | 1 |
| 1960 and earlier | 14 |

### Employees as of December 31, 1970:

| YEAR EMPLOYMENT BEGAN | NUMBER OF EMPLOYEES |
|---|---|
| 1970 | 28 |
| 1969 | 5 |
| 1968 | 5 |
| 1967 | 5 |
| 1966 | 3 |
| 1965 | 4 |
| 1964 | 2 |
| 1963 | 4 |
| 1962 | 4 |
| 1961 | 1 |
| 1960 and earlier | 13 |

The plan's method of allocating forfeitures was the basis for the Service's "disqualification" of the trust and disallowance of plaintiff's deduction for contributions thereto. Originally the defendant challenged the years 1968, 1969, and 1970. Due to integration with social security,[4] defendant no longer contests the years 1968 and

that this plan may be integrated with social security. See generally Mimeograph 6641, 1951–1 Cum.Bull. 41; Rev.Rul. 13, 1953–1 Cum.Bull. 294; Rev.Rul. 61–75, 1961–1 Cum. Bull. 140; Henderson, Integration of Qualified Plans with Social Security: Explanation, Advantages, Disadvantages, 28 N.Y.U. Tax Inst. 1093 (1970).

1970.[5] As such, now only the allocation of forfeitures for 1969 is challenged.

The table below lists the number and amount of forfeited interests in the trust:

| TAXABLE YEAR | NUMBER OF EMPLOYEES FORFEITING INTEREST | AGGREGATE AMOUNT OF FORFEITURE |
|---|---|---|
| 1962 | 15 | $ 3,697 |
| 1963 | 14 | $ 7,937 |
| 1964 | 10 | $ 4,714 |
| 1965 | 20 | $14,519 |
| 1966 | 9 | $ 6,033 |
| 1967 | 8 | $ 2,045 |
| 1968 | 8 | $ 9,796 |
| 1969 | 13 | $37,680* |
| 1970 | 15 | $10,320 |

*Includes $27,684 forfeited by Oster.

The disposition of the forfeitures is as follows:

| TAXABLE YEAR | CREDITED TO ACCOUNT OF WALKER | CREDITED TO ACCOUNT OF OSTER | ALL OTHERS |
|---|---|---|---|
| 1962 | $ 596 | $ 596 | $ 2,505 |
| 1963 | $ 1,315 | $1,315 | $ 5,307 |
| 1964 | $ 851 | $ 851 | $ 3,012 |
| 1965 | $ 3,055 | $3,055 | $ 8,409 |
| 1966 | $ 1,282 | $1,282 | $ 3,469 |
| 1967 | $ 407 | $ 407 | $ 1,231 |
| 1968 | $ 2,172 | $2,172 | $ 5,452 |
| 1969 | $10,642 | NONE | $27,038 |
| 1970 | $ 2,999 | NONE | $ 7,321 |

During 1969, Oster retired (he was then 55 years old) and, pursuant to the plan, forfeited 60 percent of his interest in the trust: $27,684.[6] As noted above, prior to retirement Oster was an officer and 50–percent shareholder of plaintiff.

After Oster's retirement, during 1969, Walker was the only prohibited group member and the sole shareholder of plaintiff. Forfeitures allocated to Walker's account in 1969 totaled $10,642. The table listed below details the amounts of contributions and forfeitures during 1968, 1969, and 1970 to Walker and the other plan participants (i. e., the "rank and file" employees).

| Salary Range | Number of Employees | Total Salary | Contribution & Forfeitures Received | Percent of Contribution & Forfeitures To Salary |
|---|---|---|---|---|
| 1968 | | | | |
| $30,000 or more | 2 | $ 60,000 | $12,284 | 20.4% |
| $7,000–$9,000 | 1 | 7,086 | 1,465 | 20.7% |
| $5,000–$7,000 | 8 | 45,888 | 7,518 | 16.4% |
| Under $5,000 | 29 | 100,534 | 16,783 | 16.7% |
| | 40 | $213,508 | $38,050 | |

| Salary Range | Number of Employees | Total Salary | Contribution & Forfeitures Received | Percent of Contribution & Forfeitures To Salary |
|---|---|---|---|---|
| 1969* | | | | |
| $30,000 or more | 1 | $ 30,000 | $14,130 | 47.3% |
| $7,000–$9,000 | 4 | 30,502 | 10,487 | 34.4% |
| $5,000–$7,000 | 7 | 39,669 | 10,612 | 26.8% |
| Under $5,000 | 35 | 124,873 | 28,988 | 23.2% |
| | 47 | $225,044 | $64,217 | |
| 1970 | | | | |
| $30,000 or more | 1 | $ 40,000 | $ 8,999 | 22.5% |
| $9,000–$11,000 | 1 | 9,056 | 1,906 | 21.0% |
| $7,000–$9,000 | 5 | 39,645 | 7,662 | 19.3% |
| $5,000–$7,000 | 7 | 41,793 | 7,585 | 18.1% |
| Under $5,000 | 29 | 104,164 | 19,366 | 18.6% |
| | 43 | $234,658 | $45,518 | |

* Oster retired in 1969 and forfeited $27,684.

These figures are unadjusted for integration. According to the stipulations of the parties, after integration with social security the disproportionate rate of contributions and forfeitures between the rank and file employees and the prohibited group becomes de minimis for the years 1968 and 1970. There remains, however, a disproportionate rate of contributions and forfeitures in favor of the prohibited group for the year 1969.

Due to the actual allocation of forfeitures in 1969, the Service ruled that the contributions made to the trust in 1969 "were not for the benefit of employees generally as required by Section 401(a) of the Code but discriminated in favor of employees who were officers and shareholders." A deficiency of $16,314.31, plus interest, was assessed for 1969. Plaintiff paid the assessed tax and interest and timely filed suit for refund in this court.

At the outset we note that at the time of the plan's adoption, the Service ruled that the method of allocating forfeitures did not discriminate in favor of the prohibited group, and a determination letter to that effect was received by plaintiff. Also, defendant has only placed the year 1969 in issue; the allocation of forfeitures for 1968 and 1970 is not discriminatory. Defendant's position is that although the form of

5. Because of defendant's concession for these years, we need not discuss the propriety of the refund claimed by plaintiff for 1968 and 1970.

6. Although defendant contends the 1958 stock redemption agreement suggests Oster's early

retirement was "long–planned and anticipated," we disagree. The agreement is designed to insure harmonious management and control in the event of certain contingencies, an early retirement being one.

plaintiff's forfeiture allocation is not inherently discriminatory, in *operation*, during 1969, the plan actually did discriminate in favor of the prohibited group (*i. e.*, Walker).

We agree with the defendant that section 401(a)(4) is concerned with the operation or functioning of the plan. *Babst Services, Inc. v. Commissioner*, 67 T.C. 131, 136 (1976); see Treas.Reg. § 1.401–1(b)(3). But a determination of discrimination depends upon the facts and circumstances of each case. *Commissioner v. Pepsi–Cola Niagara Bottling Corp.*, 399 F.2d 390 (2d Cir. 1968).

The forfeiture provision before us allocates forfeitures not on the basis of current compensation but, rather, in proportion to the account balances of the participants at the beginning of the year. Thus, there is a type of years of service factor built into this allocation formula. The longer an employee remains a participant his account balance will increase based on both his compensation for the year and the percentage of forfeited accounts to which he is entitled. Hence, an employee with many years of Service has the benefit of past years' contributions and forfeitures in determining his account balance for the allocation of current forfeitures. Treas.Reg. § 1.401–4(a)(2)(iii) specifically allows factors other than compensation to be considered subject, however, to the proviso that no discrimination results therefrom. The resolution of this case turns therefore on whether, under the instant facts, the "discrimination" proscribed by section 401(a)(4) exists.

The specific facts which we feel are important to our decision are as follows: (1) the Oster forfeiture (the cause of the disproportionate forfeiture allocation) was unforeseeable; (2) a favorable determination letter was received as to the qualified status of the plan at the time of its adoption; (3) the alleged discriminatory allocation was nonpermanent and, importantly, limited to only one year, with the years immediately preceding and succeeding the year in issue not discriminatory; (4) the disproportionate allocation was the inadvertent result of the approved forfeiture allocation formula; (5) the reallocation at issue was from the account of a prohibited group member; and (6) the plan operated for a substantial time (*i. e.*, eight years) with no discrimination.

Defendant relies solely on Rev.Rul. 71–4, 1971–1 Cum.Bull. 120, Treas.Reg. §§ 1.401–4(a)(1)(iii), 1.401–1(b)(3), and *Ludden v. Commissioner*, 68 T.C. 826 (1977), *aff'd*, 620 F.2d 700 (9th Cir. 1980), for the proposition that discrimination must be found based on one year's experience of disproportionate treatment.

While Rev.Rul. 71–4 rules, without any cited authority therefor, that a determination must be made annually that no discrimination results from the plan's method of forfeiture allocation, this does not define section 401(a)(4) "operational discrimination" as necessarily occurring in all events merely on one disproportionate allocation. Treas.Reg. § 1.401–1(a)(1)(iii) merely states that the method of forfeiture allocation must not result in "the prohibited discrimination," with no definition of "prohibited discrimination" provided. Similarly, Treas.Reg. § 1.401–1(b)(3) proscribes, without explication, "discriminat[ion] in actual operation." In *Ludden*, there were three eligible employees of the company. Two were in the prohibited group and one was a rank and file employee. By mistake no contribution was made to the rank and file employee in 1972. While the Tax Court did find this one act contravened the nondiscrimination requirements of sections 401(a)(3)(B) and 401(a)(4), the impact and value of the *Ludden* decision, for the proposition for which it is asserted by defendant, is rendered nugatory by the petitioners' concession in *Ludden* that sections 401(a)(3)(B) and 401(a)(4) were contravened. The petitioners therein argued that such discrimination, caused by an inadvertent administrative error, should be overlooked because they were willing to correct the error.

Defendant has presented no additional authority on which the irrebuttable rule in espouses can be based. In fact, the other cases upon which defendant relies as justification for the Service's withdrawal of the plan's qualified status all involve dispropor-

tionate treatment of the prohibited group in more than one year. A fact pattern extant in all of the cases relied on by defendant is a consistent pattern or a repetition of discrimination, permanently ensuring the prohibited group preferential treatment over the rank and file employees.

In *Quality Brands, Inc. v. Commissioner*, 67 T.C. 167, 173 (1976), the court held:

The amounts of forfeitures reallocated in the years at issue were relatively small, *but since the formula used for allocating them resulted in a consistent pattern of favoring the presidents of petitioners*, we find and hold that Quality's plan was discriminatory in operation for 1971 and 1972 and that Beverage's plan was discriminatory in operation for 1972.[7] [Emphasis supplied.]

In *McMenamy v. Commissioner*, 54 T.C. 1057 (1970), aff'd 442 F.2d 359 (8th Cir. 1971), involving three years, discrimination was found and the court ruled that the method of allocation of contributions (weighted by a years of service factor including years of service with the employer prior to the adoption of the plan) was known at the time of the plan's adoption to favor a prohibited group member and ensured a larger allocation to the prohibited group member. 54 T.C. at 1064. Also, in *Auner v. United States*, 440 F.2d 516, 519 (7th Cir. 1971), the prohibited group was ensured a more favorable allocation over the years by virtue of an allocation formula which was disproportionately weighted in favor of employees with seniority and previous relevant experience.

The Tax Court recently considered the same assertion argued here by the Government. In that case, *Lansons, Inc. v. Commissioner*, 69 T.C. 773, 783 (1978), it said:

Critical to our inquiry here is the meaning of "discriminatory" in section 401(a)(3)(B). Respondent, citing section 1.401–1(b)(3), Income Tax Regs., for support, interprets a discriminatory classification as being one that, however reasonable its eligibility requirements at the outset, later results in a difference in coverage in favor of the prohibited group.

We rejected that approach under what later became section 401(a)(4), in *Ryan School Retirement Trust v. Commissioner*, 24 T.C. 127 (1955). [The court then quoted the two full paragraphs on page 134 of the *Ryan* opinion. *See* pp. 304–305, *infra*. Footnotes omitted.]

The instant case, then, involves a tension between encouraging low employee turnover (by benefiting longevity of employment) and protecting the rank and file employees from abuse by the employers of the employee benefit provisions of the Internal Revenue Code, which provide extremely favorable tax treatment.

As the statutory provisions were originally enacted, Congress simply provided for the encouragement of the establishment of employee benefit plans for the benefit of employees generally. However,

[t]he movement for reform of the deduction for pension, profit–sharing and bonus plans had begun with a message to Congress from President Roosevelt on June 1, 1937. This incorporated a letter from the Secretary of the Treasury stating that the exemption "has been twisted into a means of tax avoidance by the creation of pension trusts which include as beneficiaries only small groups of officers and directors who are in the high income tax brackets." 81 Cong.Rec. 5125, 75th Cong., 1st Sess. [*quoting from Commissioner v. Pepsi–Cola Niagara Bottling Corp.*, 399 F.2d at 392.]

In 1942, after reviewing the general operation of those plans, Congress concluded the plans were, in fact, operating to benefit only stockholders and highly paid employees. To remedy such abuses, Congress en-

---

7. In the statutory notice of deficiency to Beverage Sales, the Service relied on events in two taxable years as the basis for the disallowance of the deduction. Brief for Petitioners at p. 5, *Quality Brands, Inc. v. Commissioner*, Docket Nos. 6797–74 and 6798–74, United States Tax Court. Also, the petitioners did not dispute that their officers were favored by the forfeiture allocations; instead, they urged the allocations, as mere bookkeeping errors, should be allowed to be corrected. 67 T.C. at 174.

acted the provisions which later became, during the year in issue, sections 401(a)(3), (4), and (5).[8] H.R. 2333, 77th Cong., 1st Sess. (1942), *reprinted in* 1942–2 Cum.Bull. 372, 413, 450–451; S. 1631, 77th Cong., 2d Sess. (1942), *reprinted in* 1942–2 Cum.Bull. 504, 606–607.

Since Congress has established a system to prevent abuses of the Code provisions, and since the Service is empowered to enforce that system, there is the administrative problem of asserting a proper deficiency within the statute of limitations. As such, defendant is under conflicting pressures of having enough years of operation before it in order to make a determination of the plan's qualification and being able to act on such a determination in a timely manner.

The court in *McMenamy* recognized this situation and stated:

> It is not clear at what point in time the respondent would be justified in concluding that the plan was operated in a discriminatory manner—should it wait 10 years, 15 years, or more? In addition, if after 10 years the respondent should decide that the plan is discriminatory because inadequate contributions have been made for employees other than Mr. McMenamy, it would then be too late for the respondent to do anything about the plan in its early years, for the statute of limitations would have run. [54 T.C. at 1063.]

Due to the uncertainty of any contingencies occurring which would qualify the plan, balanced against the running of the statute of limitations, the court was constrained to find discrimination based on the years of operations before it.

 We agree that due to, *e. g.*, administrability and the limited time period in which a deficiency against a taxpayer may be asserted, it is not unreasonable to require that the plan be tested annually. The burden rests on the taxpayer to prove no discrimination in operation. But if the taxpayer has carried its burden and proven by specific facts that the proscribed discrimination does not exist, no disqualification of the plan for the year in issue should be found. We also feel there is a need for certainty in this area; a plan's disqualification affects more than the employer, and we do not believe plaintiff's profit–sharing plan should be able to fluctuate in and out of qualified status solely on the facts before us. *Cf. Lansons, Inc. v. Commissioner*, 69 T.C. 773 (1978) (involving section 401(a)(3)(B)); *Pulver Roofing Co. v. Commissioner*, 70 T.C. 1001, 1012 (1978) (stating *Lansons* was concerned with minor year–to–year fluctuations in coverage resulting in a plan's qualified status changing year to year without the slightest change of a permanent nature).

After reviewing the operation of the plan in 1969 and also in the years preceding and the year succeeding 1969, under the peculiar facts of this case, we feel there was no discriminatory operation within the meaning of section 401(a)(4) in 1969.

The Tax Court in *Ryan School Retirement Trust v. Commissioner*, 24 T.C. 127, 134 (1955), held:

> We think that discrimination within the meaning of the statute embodies some real preferential treatment in favor of the officers as against the rank and file employees. That kind of discrimination is not present here, however, because no provision of the plan itself was inherently discriminatory, nor was there any ulterior motive to frame its provisions to channel the major part of the funds to the officer group because of any events or circumstances which the management foresaw or expected to occur. * * *

> The respondent did not argue that the vesting provisions and the method of distributing forfeitures used here were inherently discriminatory. Those provisions, however, are the cause of the alleged discriminatory division of the trust funds. But such provisions as were present here would in any plan inevitably

---

**8.** Subsequently, the Employee Retirement Income Security Act of 1974, Pub.L.No. 93–406, provided extensive revisions of the law in this area.

operate to give all *permanent* employees (including both officers and rank and file employees) a preferred position over that group of employees among which turnovers are frequent. If there is any discrimination here, it would seem to be in favor of the permanent employees as against the impermanent employees, but that is not the type of discrimination contemplated by the statute.

Although the *Ryan* decision has been limited somewhat by subsequent decisions, *e. g., John Duguid & Sons, Inc. v. United States,* 278 F.Supp. 101 (N.D.N.Y.1967); *McMenamy v. Commissioner, supra; Ed & Jim Fleitz, Inc. v. Commissioner,* 50 T.C. 384 (1968), the case does articulate a valid concept; namely, where an allocation formula seeks to benefit long-term employees and such formula is not inherently discriminatory, and if, on the whole, there is no real preferential treatment in favor of the prohibited group at the expense of the rank and file plan participants, then discrimination within the meaning of section 401(a)(4) does not exist.

We note that in this case there were rank and file employees employed and participating in the plan from the year of its inception until 1969; among those employees and the prohibited group there is a nondiscriminatory relationship between contributions and forfeitures and current compensation. While we recognize discrimination must be tested against all plan participants, we also feel this data is of some value to this particular inquiry.

Based on all the facts before us, we can find no such real preferential treatment of the prohibited group which justifies a denial of plaintiff's contributions to the trust for 1969. The plan was validly established to encourage low employee turnover; this is a permissible goal for any such plan. Treas.Reg. § 1.401–4(a)(2)(iii). Under plaintiff's formula, rank and file workers with long years of employment similarly have an advantage over other workers. While plaintiff was on notice that the plan could later operate to discriminate in the proscribed manner, the mere occurrence of a single disproportionate forfeiture allocation like that before us, without more, does not disqualify the plan. *See Sherwood Swan & Co. v. Commissioner,* 42 T.C. 299 (1964), *aff'd,* 352 F.2d 306 (9th Cir. 1965).

We cannot conclude that the plan may fairly be characterized as operating as a vehicle only for the benefit of the prohibited group. We stress that in this case there is the total absence of a showing of any pattern or reoccurrence of disproportionate treatment either before or after 1969. Under these facts, more is required for us to find the plan is not operating for the benefit of employees generally and that the events in 1969 disqualified the trust for that year. *Cf. Ray Cleaners, Inc. v. Commissioner,* 1968 TCM (P–H) ¶ 68,006.

Because of our resolution of this case in the above manner, we need not reach plaintiff's alternative argument that the retroactive revocation of the qualified status of the trust was an abuse of discretion under section 7805(b).

## CONCLUSION OF LAW

Since the operation of the plan was not discriminatory within the meaning of section 401(a)(4), the trust retains its tax–exempt status for 1969 and any contributions by plaintiff thereto are accordingly deductible. The relief sought in plaintiff's petition is hereby granted, and plaintiff is therefore awarded $16,314.31, plus interest.